283 F.Supp.2d 674 (2003)
Dr. Gabriel D. ALUNGBE, Plaintiff,
v.
BOARD OF TRUSTEES OF CONNECTICUT STATE UNIVERSITY (CSU) SYSTEM, Dr. William J. Ciges, Jr., Central Connecticut State University, Dr. Richard L. Judd, Dr. Pearl W. Bartelt, Dr. Zdzislaw B. Kremens, Dr. Merle W. Harris, Dr. John W. Shumaker, Dr. George R. Muirhead, Dr. Karen C. Beyard, Dr. John R. Wrigt, Dr. Andrew W. Baron, Mr. Lennard F. Lema, Mr. Daryll C. Dowty, Defendants.
No. 3:01 CV 0503(GLG).
United States District Court, D. Connecticut.
September 4, 2003.
*675 *676 *677 Joseph A. Moniz, Moniz, Cooper & McCann, Hartford, CT, for plaintiff.
Sharon A. Scully, Joseph A. Jordano, Attorney General's Office Employment Rights Hartford, CT, for defendants.

OPINION
GOETTEL, District Judge.
The plaintiff, Dr. Gabriel D. Alungbe, has filed this action against the defendant Board of Trustees of Connecticut State University System ("the Board"), Central Connecticut State University ("Central"), and numerous administrators of the University. In Counts One through Three, he alleges that the Board and Central violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., and Connecticut's Fair Employment Practices Act, Conn. Gen.Stat. § 46a-58 and § 46a-60 et seq., ("CFEPA"), by failing to promote him due to his race (non Anglo-Saxon) and national origin (Nigerian) and in retaliation for his previous complaints of racial discrimination. In Counts Four through Six, he alleges that various University officials[1] violated CFEPA by harassing, humiliating, and failing to promote him, and that they negligently and intentionally inflicted emotional distress upon him. As relief, he seeks compensatory *678 damages, punitive damages, a retroactive promotion to associate professor and salary adjustment, a promotion to full professor, an injunction prohibiting the defendants from harassing and intimidating him on the basis of his race and/or national origin and from retaliating against him, and costs and attorney's fees.
Pursuant to Rule 56, Fed.R.Civ.P., the defendants have moved for summary judgment [Doc. No. 24] on all counts. The defendants' motion for summary judgment will be granted as to all counts except Count One, for which it will be granted in part and denied in part.

BACKGROUND
The plaintiff, Dr. Gabriel B. Alungbe, began working at Central as an Assistant Professor in the Department of Engineering Technology in January 1991. On December 16, 1996, he was granted tenure, and in August 1997, he was appointed Chairperson of the Department of Engineering Technology.
The plaintiff alleges that in 1991, several of the individual defendants misrepresented his qualifications to an accreditation evaluation team, in an effort to embarrass and humiliate him. Further misrepresentations about the number of publications by the plaintiff occurred in 1995. The plaintiff claims that defendant Wright refused to fund international travel requests of the plaintiff in 1994, despite the fact that travel requests of white Anglo-Saxon faculty members were funded. The plaintiff also complains that some of the individual defendants scheduled him to teach courses outside of his area of expertise, that he was assigned more new courses to teach than any Anglo-Saxon white faculty member in the School of Technology,[2] and that he was assigned to teach every week-day during the 1995 spring semester, thus limiting his ability to perform research.
Commencing in April 23, 1996, the plaintiff began complaining to the Affirmative Action Director at Central about the racial discrimination to which he had allegedly been subjected by defendant Wright, the Dean of the School of Technology at Central. After one of his summer classes with an enrollment of only five students was canceled, in August of 1996, he filed an informal complaint of discrimination with the Affirmative Action Office and with the Ombudsman's Office at Central against defendant Wright. From 1995 to 1997, defendant Wright did not recommend the plaintiff for promotion.[3] In June 1997, the plaintiff was notified by letter of the results of the investigation of his complaints of discrimination: namely, a finding of no discrimination. The letter further advised the plaintiff that to address the "perception" that a discriminatory climate exists in the School of Technology, Central had hired a diversity consultant to investigate this situation. The consultant issued a 17-page "Diversity Climate Audit Report" addressing numerous areas needing improvement.
In July 1997, the plaintiff filed with Central another formal complaint of racial discrimination by defendant Wright. In February 1998, he was again advised of a finding of no discrimination.
Additionally, since the 1995-96 academic year, the plaintiff has applied for promotion *679 from Assistant Professor to Associate Professor on six occasions.[4] Each time his application has been denied.
At Central, the promotion process is governed by the collective bargaining agreement ("CBA") between the Connecticut State University Association of University Professors ("AAUP") and the Board. Five criteria are considered in the evaluation process: (i) load credit activity; (ii) creative activity; (iii) productive service to the department or university; (iv) professional activity; and (v) years in rank. The process begins during the fall of the academic year during which a professor is seeking a promotion.[5] Between November and March, the Department Evaluation Committee ("DEC"), the dean of the applicant's school, and the university-wide Promotion and Tenure Committee ("P & T") independently review the professor's application for promotion and independently make recommendations to the university president. The president then makes a recommendation to the Board by April 15th. The Board announces its promotion actions by May 15th.
During the 1999-2000 school year, the plaintiff received recommendations for promotion to Associate Professor from his DEC, Dean, and P & T, but Central President Judd did not recommend that the plaintiff be promoted. In response, the plaintiff made an oral affirmative action complaint to the Director of Affirmative Action at Central alleging that President Judd had discriminated against him by denying his request for a promotion. On June 5, 2000, the Board approved defendant Judd's decision not to promote the plaintiff.
During the 2000-01 school year, the DEC recommended the plaintiff for promotion, but neither Dean Kremens nor President Judd recommended the plaintiff for promotion. The plaintiff was not promoted.
On August 1, 2000, the plaintiff dual-filed a complaint of discrimination with the Connecticut Commission on Human Rights and Opportunities ("CCHRO") and the Equal Employment Opportunity Commission (EEOC) against the Board, Central, President Judd, and Dean Wright.[6] The plaintiff alleges that on or about December 14, 2000, defendant Kremens retaliated against him by again not recommending him for promotion. That same day, the CCHRO dismissed the plaintiff's complaint, and on January 5, 2001, it released its jurisdiction of the plaintiff's complaint to the EEOC. The EEOC adopted the CCHRO's findings on July 31, 2001, dismissing the EEOC complaint and issuing a notice of a right to sue.

STANDARD OF REVIEW
The standard for granting a motion for summary judgment is well-established. A moving party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of *680 law." Fed.R.Civ.P. 56(c). The burden of establishing that there is no genuine factual dispute rests with the moving party. See Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1223 (2d Cir. 1994). In ruling on a motion for summary judgment, the Court must resolve all ambiguities and draw all reasonable inferences in favor of the plaintiff as the non-moving party. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
At the same time, when a motion is made and supported as provided in Rule 56, Fed.R.Civ.P., the non-moving party may not rest upon mere allegations or denials of the moving party's pleadings, but instead must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e). In other words, the non-moving party must offer such proof as would allow a reasonable jury to return a verdict in its favor. Anderson, 477 U.S. at 256, 106 S.Ct. 2505; Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir.2000). This Court's "function at this stage is to identify issues to be tried, not decide them." Graham, 230 F.3d at 38.
In the context of employment discrimination cases where intent and state of mind are at issue, the Second Circuit has cautioned that summary judgment should be granted sparingly, because careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination. Id. (internal citations omitted).

DISCUSSION

I. Federal ClaimsTitle VII
The plaintiff alleges that the Board and Central violated Title VII by failing to promote him because of his race and national origin (Count One) and by retaliating against him for bringing previous complaints of racial discrimination (Count Two).

A. Statute of Limitations
Title VII requires that, before bringing suit under the statute, a plaintiff must first file a complaint with the EEOC or with a state equal employment agency within 180 or 300 days, respectively, of the alleged discrimination. See 42 U.S.C. § 2000e-5(e)(1); Quinn v. Green Tree Credit Corp., 159 F.3d 759, 765 (2d Cir. 1998). This requirement functions as a statute of limitations, barring any discriminatory incidents not timely brought before the EEOC or state agency. Quinn, 159 F.3d at 765.
The Supreme Court recently discussed this time framework. "A discrete retaliatory or discriminatory act `occurred' on the day that it `happened.' A party, therefore, must file a charge within ... 300 days of the date of the act or lose the ability to recover for it." Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 110, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Furthermore, the Supreme Court noted that "discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable `unlawful employment practice.'" Id. at 114, 122 S.Ct. 2061. "[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Id. at 112, 122 S.Ct. 2061.
In this case, the plaintiff's failure to promote claims are precisely the type of discrete acts described by the Supreme Court in National Railroad. Although the plaintiff noted in his EEOC charge that he had been repeatedly denied promotions, the specific claim he alleged was the discrete act of not being promoted to *681 Associate Professor for the 1999-2000 academic year. In this action, however, he seeks redress under Title VII for all of promotion denials and acts of alleged retaliation relating back to the 1995-96 school year.[7]
An exception to the statutory time bar exists for continuing violations, extending the time period for "discriminatory acts committed under a policy of discrimination even if those acts, standing alone would have been barred by the statute of limitations." Quinn, 159 F.3d at 765 (citation omitted). But the district courts of this circuit have consistently recognized refusals to promote as "separate and distinct" actions. Mills v. State of Conn., No. 3:00CV935, 2003 WL 1860523, at *4 (D.Conn. Apr.7, 2003); see also Roberts v. Judicial Dep't, No. 99CV14, 2001 WL 777481, at *4 (D.Conn. Mar. 28, 2001). In cases where discrete acts have been found to constitute continuing violations, the courts have required plaintiffs to produce evidence showing that the incidents of discrimination resulted from an underlying policy or mechanism of discrimination, such as discriminatory seniority lists or discriminatory employment tests. Lambert v. Genesee Hosp., 10 F.3d 46, 53 (2d Cir.1993) (internal citations omitted), cert. denied, 511 U.S. 1052, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994).
The plaintiff has not demonstrated that his promotion denials stemmed from an underlying policy or mechanism of discrimination. He has merely made the conclusory assertions that the repeated denials of promotions were the result of a continuing course of discrimination. This is not sufficient to overcome the 300-day filing requirement of Title VII. Because a continuing violation has not been established, any of the plaintiff's claims that occurred more than 300 days prior to August 1, 2000 are beyond the limitations period of Title VII. Therefore, all claims relating to promotional decisions made prior to October 6, 1999 are time-barred. The only discrimination claims for failure to promote that are not time-barred are for the academic years 1999-2000 and 2000-01. Similarly, with respect to alleged acts of retaliation that took place prior to October 6, 1999, these also are time-barred.

B. Exhaustion of Administrative Remedies
A district court only has jurisdiction to hear Title VII claims that are included in an EEOC charge or are based on conduct "reasonably related" to that alleged in the EEOC charge. Butts v. City of N.Y. Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1401 (2d Cir.1993), superseded by statute on other grounds as stated in Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684 (2d Cir.1998). The exhaustion of administrative remedies is an "essential element" of the Title VII statutory scheme and functions as a prerequisite to bringing such claims in federal court. Legnani v. Alitalia Linee Aeree Italiane, 274 F.3d 683, 686 (2d Cir.2001).

1. Failure to Promote
In his EEOC charge, the plaintiff alleged a failure to promote claim for the 1999-2000 school year. The EEOC issued a right-to-sue letter with respect to this claim and, thus, there was an exhaustion of administrative remedies.
*682 The plaintiff, however, now also alleges discrimination in the denial of a promotion for the 2000-01 academic year. (As we have already held, any claims for failure to promote in earlier years are time-barred.) As discussed above, each denial of a promotion is considered a discrete act that would have to be reported separately to the EEOC. Nat'l R.R., 536 U.S. at 111, 122 S.Ct. 2061. Obviously, the 2000-01 promotion denial was not included in the EEOC charge filed on August 1, 2000, since that denial would not have occurred at that time. There is no indication that the plaintiff ever amended his EEOC charge to include that promotion denial or that he ever filed a separate charge of discrimination concerning that denial. Thus, although the 2000-01 promotion denial is not time-barred, this Court may not consider it because the plaintiff has failed to exhaust administrative remedies with respect to this claim.

2. Retaliation
The defendants argue that the claims for retaliation in Count Two should be dismissed, because the plaintiff has not exhausted his administrative remedies. The plaintiff has failed to respond to this argument, and his opposition brief only focuses on the failure to promote claim under Count One.
The EEOC charge included a retaliation claim relating to the plaintiff's complaints of discrimination in 1996-97, but as we have already noted, actions prior to October 6, 1999 are time-barred.
The only other retaliation claim in the plaintiff's complaint is the allegation that Dean Kremens retaliated against the plaintiff on or about December 14, 2000, when he did not recommend him for promotion. (Compl. ¶ 15.) Between December 1999 and April 2000, Dean Kremens allegedly warned the plaintiff not to file an affirmative action complaint with the University. (Alungbe Dep. ¶¶ 72-79.) In April 2000, the plaintiff ignored Kremens' warning and made an oral complaint of discrimination to the Affirmative Action Office. The plaintiff alleges that Dean Kremens then retaliated against him by not recommending him for promotion in December 2000. (Compl.IV, ¶ 5.) The plaintiff was subsequently not promoted in 2000-01. This alleged act of retaliation was not included in the plaintiff's EEOC complaint, which was filed after the alleged warning by Kremens but before Kremens failed to recommend him.
Although this claim of retaliation was not part of the plaintiff's EEOC charge, it may still be considered by this Court if it is "reasonably related" to the allegations in the EEOC charge. Butts, 990 F.2d at 1402. It is unlikely that the retaliation claim against Kremens would have fallen within the scope of an EEOC investigation, because it concerns conduct that occurred subsequent to the filing of the EEOC charge. Kremens is not even mentioned in the EEOC charge. Also, as noted above, the promotion denial in 2000-01 was not included in the charge and has never been considered by the EEOC or CCHRO. Thus, the alleged retaliation by Kremens cannot be said to be reasonably related to the allegations of retaliation set forth in the EEOC charge, which occurred three to four years earlier.
Accordingly, we grant summary judgment for the defendants on Count Two because all of the retaliation claims alleged by the plaintiff are either time-barred or the plaintiff failed to exhaust administrative remedies with respect to these claims.

3. Allegations Not Included in EEOC Charge
The defendants suggest that many of the facts alleged in the complaint, specifically *683 paragraphs 8, 10, 17, and 21 through 31, must not be considered by this Court because they were never alleged in the EEOC charge. Although many of these facts involve events before October 6, 1999, so they cannot be used as the basis for actual claims, they may be relevant background material or to explain the conduct of the defendants.

C. Burden Shifting Analysis of Failure to Promote
In Title VII cases, the plaintiff has the burden of establishing a prima facie case of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In order to establish a prima facie case, the plaintiff must show that (i) he belonged to a protected class; (ii) he was qualified for the position; (iii) he suffered an adverse employment action; and (iv) the circumstances surrounding that adverse employment action give rise to an inference of discrimination. See, e.g., Collins v. N.Y. Transit Auth., 305 F.3d 113, 118 (2d Cir.2002). The plaintiff's burden in setting out the prima facie case is "minimal." Id.
If the plaintiff succeeds in establishing a prima facie case, a presumption of discrimination arises and the burden then shifts to the employer to proffer a legitimate reason for the denial of the plaintiff's promotion. See Burdine, 450 U.S. at 254, 101 S.Ct. 1089.
Finally, if the employer has offered such a reason, the presumption created by the prima facie case drops out of the analysis, James v. N.Y. Racing Ass'n, 233 F.3d 149, 154 (2d Cir.2000), and "the burden shifts back to the plaintiff to prove that discrimination was the real reason for the employment action," Graham, 230 F.3d at 38. Therefore, unless the plaintiff can produce evidence that reasonably supports a finding of discrimination, the employer will be entitled to summary judgment. James, 233 F.3d at 154.

1. Prima Facie Burden
It is not disputed that the plaintiff is a member of a protected class and was not promoted to Associate Professor; therefore, we only need to examine whether the plaintiff was qualified and whether the circumstances give rise to an inference of discrimination.
The plaintiff argues that he was qualified for the position, because every year he sought promotion, the DEC supported his promotion. More importantly, in 1999-2000, he was recommended by his DEC, Dean, and P & T Committee. Because all three entities reviewed his application independently, adhering to the standards of the CBA, it would appear that the plaintiff met those qualifications and has satisfied the qualification prong of the prima facie case.
Regarding the final prong, there is no rigid rule for determining whether a plaintiff has demonstrated circumstances giving rise to an inference of discrimination. Chertkova v. Conn. Gen. Life Ins., 92 F.3d 81, 91 (2d Cir.1996). "The Court must be alert to the fact that employers are rarely so cooperative as to include a notation in the personnel file that their actions are motivated by factors expressly forbidden by law." Chambers v. TRM Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994). Several ways to demonstrate an inference of discrimination include showing preferential treatment for employees outside of the protected class, id., or that the plaintiff was treated less favorably than "similarly situated" employees outside the protected group, Graham, 230 F.3d at 39. Usually the question of whether two employees *684 are similarly situated is one for the jury. Id.
In this case, the plaintiff and the defendants disagree as to whether certain employees who received promotions were similarly situated. The plaintiff alleges that many Anglo-Saxon white faculty members with lesser credentials were promoted, (Compl.IV. ¶ 16-17), while he was not. The defendants respond that these individuals are not similarly situated. A cursory review of the "paper" qualifications of the individuals cited by the plaintiff reveals that some appear more similarly situated to the plaintiff than others. However, when the facts are construed in the light most favorable to the plaintiff, we cannot say that the plaintiff has not met his minimal burden of establishing circumstances giving rise to an inference of discrimination, particularly in light of the fact that he has been denied promotions on six or seven occasions.
The defendants argue that the plaintiff should be compared with Professor Odesina who is also Nigerian, has a similar academic background, and has been at Central for roughly the same period of time as the plaintiff. Odesina was promoted to Associate Professor after only five years as Assistant Professor and is currently the Associate Dean. The defendants argue that the primary distinction between the two individuals is that Odesina has published much more than the plaintiff. While this evidence may be relevant to the ultimate issue of pretext, it does not defeat the plaintiff's prima facie case of discrimination.
Additionally, although showing disparate treatment of similarly situated non-minority employees is a common and effective method of proving the fourth prong, the Second Circuit has recognized that it is not the only method. See Abdu-Brisson v. Delta Air Lines, 239 F.3d 456, 468 (2d Cir.2001). Other ways to meet this burden include evidence that the sequence of events leading to the plaintiff's promotion denials suggests discrimination, whether the employer made ethnically degrading remarks regarding the plaintiff's performance, or whether the employer continued to seek persons of the plaintiff's qualifications for a position after the plaintiff had been denied the position. See id.; see also Chambers, 43 F.3d at 37.
Even though we are considering only the claim for failure to promote in 1999-2000 as part of the plaintiff's case under Title VII, the repeated pattern of the previous promotion denials could give rise to an inference of discrimination, especially since in 1999-2000, the plaintiff received recommendations from each level of review except the final one.
In addition, the University had a history of discrimination complaints made by women and minorities. (Harmon Ltr. Nov. 13, 1996.) During 1996, four employees from the School of Technology had raised complaints to the University's Director of Affirmative Action about discrimination and a hostile work environment toward women and minorities, including disparities in pay and the lack of individuals from those groups on an administrative council. (Id.) In response, the University conducted an investigation in 1997 and found no discrimination, but the Affirmative Action Director acknowledged in a letter to the plaintiff that "[t]he Dean is aware of the perception that a climate exist (sic) in the School of Technology and Institute for Industrial Engineering and Technology ... that protected group members find discouraging because of alleged discriminatory treatment and insensitivity." (EEOC Compl. ¶ 10; Defs.' Resp. ¶ 10.) The University also hired diversity consultants who concluded that racist and sexist attitudes and behaviors did exist, *685 but they were infrequent. (Diversity Report 9-10.) They also noted that the technology field has been traditionally white-male dominated and that there was an unhealthy collegial situation where colleagues chose or fell into patterns of proving discrimination or reverse discrimination. (Id. at 5, 9-10.)
The combination of these circumstances could give rise to an inference of discrimination. Because the plaintiff's burden in establishing the prima facie case is minimal, we must conclude that the plaintiff has satisfied his prima facie burden.

2. Defendants' Proffered Non-discriminatory Reason
The defendants argue that even if the plaintiff has satisfied his prima facie burden, their decision to deny the plaintiff's promotion was based on the legitimate, non-discriminatory reason that he had not fulfilled the promotion criterion under the CBA of "creative activity" based primarily on the plaintiff's lack of published works.
In 2000, President Judd, the ultimate decisionmaker on whether faculty members should be recommended to the Board for promotion, disagreed with the decisions of the DEC, Dean Kremens, and the P & T committee, who had all recommended the plaintiff's promotion. President Judd believed that the plaintiff had not contributed significantly enough in the area of "creative activity." At the time, the plaintiff had four works "in preparation." President Judd testified that he makes creative activity decisions on a case-by-case basis, considering numerous factors including the number of publications, the quality of the work in the journal, and whether there has been a progression of the applicant's activities. (Judd Dep. 97.)
Further support for the President's decision could be found during the following promotion year, when Dean Kremens appears to have changed his view about the plaintiff's scholarship. In the 2000-01 academic year, he recommended that the plaintiff not be promoted and suggested that the plaintiff "launch a more substantial scholarly agenda." (Kremens Ltr. Dec. 14, 2000, Def.'s Ex. 35, 5.)
The defendants' proffered reason need not persuade this Court that they were actually motivated by that reason. Burdine, 450 U.S. at 255, 101 S.Ct. 1089. The proffered reason of insufficient creative work is a legitimate, non-discriminatory reason, and the defendants have successfully rebutted the plaintiff's prima facie case.

3. Pretext
The plaintiff argues that the defendants' proffered reason of a lack of creativity is a mere pretext for racial discrimination. He points to the fact that a professor's number of publications is but one example of creative activity. Other examples include research and delivering papers at professional conferences, both of which the plaintiff did, but which accomplishments, he asserts, were ignored by the defendants. He also points to his positive recommendations by the three lower levels of reviewers, who used the same criteria to determine whether he should be promoted. The defendants respond that during 1999-2000, other individuals were also turned down for promotions by the President, even though they had positive reviews from the lower levels of review.
Nevertheless, when all of the evidence is viewed in the light most favorable to the plaintiff and when all reasonable inferences are drawn in his favor, a jury could reasonably conclude that the pattern of previous complaints of discrimination by minorities and women, the repeated denials of the plaintiff's applications for promotion, *686 comparisons to other individuals, and plaintiff's other accomplishments in the area of "creative activity" indicate that his promotion denial stemmed from discrimination, not from lack of sufficient "creative activity." There is at least a triable issue of fact in this regard.
Accordingly, we find genuine issues of material facts regarding whether the university was motivated by discrimination in denying the plaintiff's promotion or whether its decision was purely based on the legitimate, nondiscriminatory reason of insufficient creative work. Because these facts are in dispute and a reasonable jury could find in favor of the plaintiff, we must DENY the defendant's motion for summary judgment on the failure to promote Title VII claim for the 1999-2000 year.

II. State-Law Claims

A. Jurisdiction Over the Defendants

1. Dismissed Parties
In April 2001, the plaintiff voluntarily dismissed claims [Doc. 4] against defendants Bartelt, Shumaker, Muirhead, Beyard, Baron, and Lema without prejudice. Accordingly, we need not consider the defendants' motion insofar as it relates to these individual defendants.

2. Jurisdiction Over Remaining Defendants in Their Individual Capacities
The remaining individual defendants next assert that all claims against them in their individual capacities must be dismissed because they were never properly served. Pursuant to Rule 4, Fed.R.Civ. P., the defendants must be served personally or at their abodes. Service in their official capacity is not sufficient to constitute personal service. See Burgos v. Dep't of Children & Families, 83 F.Supp.2d 313, 316 (D.Conn.2000). The plaintiff concedes that defendants Cibes, Judd, Kremens, Wright, and Dowty were only served in their official capacities. (Pl.'s Rule 9(c)2 St.) Accordingly, the allegations against Cibes, Judd, Kremems, Wright, and Dowty in their individual capacities are dismissed.

3. Defendant Merle Harris
It is not clear whether Merle Harris was served in both her personal and official capacities or simply in her official capacity. Her summons was sent to her new place of employment, but it is not clear whether she was served in-hand. The plaintiff has not addressed this issue. Nevertheless, any claims against Harris would be time-barred, because she only served as the interim president of Central from June 1995 until June 1996. The plaintiff's Title VII claims are barred before October 6, 1999; his CFEPA claims would be barred prior to February 3, 2000; and his state-law tort claims of negligent infliction of emotional distress and intentional infliction of emotional distress would be barred prior to March 29, 1999 and March 29, 1998, respectively.[8] Accordingly, the claims against Merle Harris are time-barred and dismissed.

B. Individual Liability under CFEPA § 46a-60(a)(1)
In Count Four, the plaintiff alleges that certain of the individual defendants violated the CFEPA, Conn. Gen.Stat. § 46a-60(a)(1), by harassing, humiliating and wrongfully failing to promote him. In *687 Perodeau v. City of Hartford, 259 Conn. 729, 744, 792 A.2d 752 (2002), the Connecticut Supreme Court held that individuals who are not employers may not be held liable under § 46a-60(a)(1). Therefore, all claims under § 46a-60(a)(1) against the individual defendants are dismissed.

C. No Private Right of Action Under CFEPA § 46a-58
Additionally, in Counts Three and Four, the plaintiff has attempted to assert claims against Central, the Board, and the individual defendants under CFEPA, Conn. Gen.Stat. § 46a-58.[9] The courts have held that this section provides no private right of action. Garcia v. Saint Mary's Hosp., 46 F.Supp.2d 140, 142 (D.Conn.1999) (finding that claims under this section can only be pursued through the CCHRO's administrative procedures). Thus, we dismiss the plaintiff's claims under this section of the CFEPA.

D. Eleventh Amendment Immunity
In Counts Three and Four, the plaintiff alleges that the Board, Central, and the individual defendants violated CFEPA by harassing, humiliating, and wrongfully failing to promote him because of his race and national origin.
The Eleventh Amendment bars suits for money damages against a state or its agencies unless the state has unequivocally consented to be sued. Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 99, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). The courts have consistently held that Connecticut state universities and their boards of trustees are entitled to claim immunity under the Eleventh Amendment. Brown v. W. Conn. State Univ., 204 F.Supp.2d 355, 361 (D.Conn. 2002); see also Barde v. Bd. of Trs. of Reg'l Comm. Colls., 207 Conn. 59, 64, 539 A.2d 1000 (1988). This immunity also extends to state officials sued in their official capacities. See Kentucky v. Graham, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); Gaynor v. Martin, 77 F.Supp.2d 272, 281 (D.Conn.1999).
A state may be subject to suit in federal court one of two ways: (i) Congress can divest a state of immunity through a statutory enactment, as it has done with Title VII; or (2) a state may waive its immunity and agree to be sued in federal court. Close v. New York, 125 F.3d 31, 39 (2d Cir.1997). However, a state may consent to suit in its own courts without consenting to suit in federal court. Smith v. Reeves, 178 U.S. 436, 441-45, 20 S.Ct. 919, 44 L.Ed. 1140 (1900).
Under Connecticut law, Conn. Gen.Stat. § 46a-100,[10] Connecticut waived its immunity for suit in state court for CFEPA claims. But it has not clearly expressed a waiver to suit in federal court. Therefore, the courts of this district have consistently found that CFEPA claims against the state or its agents are barred by the Eleventh Amendment. See, e.g., *688 Lyon v. Jones, 168 F.Supp.2d 1, 6 (D.Conn.2001).
Counts Three and Four are CFEPA claims against Central, the Board, and named officials in their official capacities. All of these defendants are agents of the State of Connecticut, which is protected by immunity under the Eleventh Amendment. Accordingly, summary judgment in favor of the defendants is granted as to Counts Three and Four

E. Connecticut Common-Law Claims
The state also has immunity under the Eleventh Amendment for state common-law claims. See Pennhurst, 465 U.S. at 106, 104 S.Ct. 900 ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law"); Cates v. Conn. Dep't of Corr., No. 3:98CV2232, 2000 WL 502622, at *12 (D.Conn. Apr.13, 2000).
Following the same reasoning that we used for the CFEPA claims, the individual defendants who were sued in their official capacities are agents of the state, protected by the Eleventh Amendment. Therefore, we grant summary judgment in favor of the defendants on Counts Five and Six for negligent infliction of emotional distress and intentional infliction of emotional distress.[11]

CONCLUSION
To summarize, summary judgment in favor of the defendants is GRANTED on the plaintiff's Title VII failure to promote claims (Count One) for all academic years except 1999-2000. Similarly, summary judgment is GRANTED on the plaintiff's Title VII retaliation claims (Count Two). The claims against Bartelt, Shumaker, Muirhead, Beyard, Baron, and Lema had been previously and voluntarily dismissed. The claims against Merle Harris are dismissed as time-barred. To the extent that the plaintiff has asserted claims against the other named individuals, Cibes, Judd, Kremens, Wright, and Dowty,[12] they were not personally served and, therefore, are sued only in their official capacities and have the protection of Eleventh Amendment immunity. Additionally, there is no private right of action under Conn. Gen. Stat. § 46a-58; and there is no individual liability under Conn. Gen.Stat. § 46a-60(a)(1) (Count Four). Plaintiff has not alleged conduct sufficiently extreme or egregious to state a cause of action for intentional infliction of emotional distress (Count Five), and there is no individual liability for negligent infliction of emotional distress in an ongoing employment context where there has not been a termination (Count Six). Therefore, summary judgment is GRANTED on Counts Four *689 through Six. Additionally, summary judgment is GRANTED on Count Three against the Board and CFEPA on sovereign immunity grounds.
The only remaining cause of action in this suit is the Title VII failure to promote claim in Count One for the 1999-2000 academic year against the Board and Central, for which the defendants' summary judgment motion is DENIED.
SO ORDERED.
NOTES
[1] These claims are asserted against nine of the twelve individual named defendants. No claims are asserted against defendants Shumaker, Cibes, and Kremens.
[2] No dates are provided for these assignments.
[3] The plaintiff also alleges that in a 1992 memo, defendant Wright misrepresented the plaintiff's committee activities to two of the other defendants. It is not at all clear from the complaint what impact, if any, this 1992 memo allegedly had on the plaintiff's applications for promotion, which began during the 1995-96 academic year.
[4] The complaint refers to six promotion denials. It appears from the plaintiff's opposition brief that there was a most recent seventh promotion denial.
[5] The plaintiff and the defendants have used different terms in their briefs when describing a "promotion year." We will refer to the promotion year as the year in which promotion decisions are made. For example, decisions made in the fall of 1999 and spring of 2000 are for the 1999-2000 academic year, not the 2000-01 year, as the plaintiff suggests.
[6] For simplicity, we will refer to this complaint as the EEOC charge, even though it was dual-filed with the CCHRO.
[7] The plaintiff's memorandum in opposition to the summary judgment motion also refers to his 2001-02 promotion denial, which is not mentioned in the complaint. For the reasons discussed below with respect to his 2000-01 promotion denial, this claim will not be considered by the Court.
[8] The state statute of limitations requires CFEPA claims to be filed within 180 days after the alleged act of discrimination. Conn. Gen.Stat. § 46a-82(e). The statute of limitations applicable to claims of negligent infliction of emotional distress is two years. Conn. Gen.Stat. § 52-584. The statute of limitations for intentional infliction of emotional distress is three years. Conn. Gen.Stat. § 52-577.
[9] Section 46a-58(a) provides:

(a) It shall be a discriminatory practice in violation of this section for any person to subject, or cause to be subjected, any other person to the deprivation of any rights, privileges or immunities, secured or protected by the constitution or laws of this state or of the United States, on account of religion, national origin, alienage, color, race, sex, blindness or physical disability.
[10] "Any person who has timely filed a complaint with the Commission on Human Rights and Opportunities in accordance with section 46a-82 and who has obtained a release from the commission ... [for] any action involving a state agency or official may be brought in the superior court for the judicial district of Hartford." Conn. Gen.Stat. § 46a-100.
[11] An additional ground for dismissing the plaintiff's claim for intentional infliction of emotional distress is that the plaintiff has not alleged nor provided evidence of conduct by the defendants that was so extreme and outrageous in character as to meet the requirements imposed by the Connecticut courts on a cause of action for intentional infliction of emotional distress in an employment setting. See, e.g., DeLaurentis v. City of New Haven, 220 Conn. 225, 267, 597 A.2d 807 (1991); Petyan v. Ellis, 200 Conn. 243, 254, n. 5, 510 A.2d 1337 (1986). With respect to the plaintiff's claim against th individual defendants for negligent infliction of emotional distress, in Perodeau, 792 A.2d at 762-63, the Connecticut Supreme Court held that an individual employee may not be found liable for negligent infliction of emotional distress arising out of conduct occurring within a continuing employment context, as distinguished from conduct occurring in the termination of employment. Here, since there was no termination of the plaintiff, the individual defendants cannot be held liable for negligent infliction of emotional distress.
[12] See Note 1, supra.