Roland COCKFIELD

v.

UNITED TECHNOLOGIES CORP., PRATT & WHITNEY DIVISION

No. 3:00CV564(JBA).

United States District Court, D. Connecticut.

Sept. 30, 2004.

Charles G. Parks, Jr., Parks & Associates, Stamford, CT, for Plaintiff.

US Court of Appeals, New York City, Kurosh L. Marjani, Wofsey, Rosen, Kweskin & Kuriansky, Stamford, CT, Albert Zakarian, Daniel Adam Schwartz, Day, Berry & Howard, Hartford, CT, Meredith G. Diette, Brown Jacobson, Norwich, CT, for Defendant.

## Memorandum of Opinion and Order

ARTERTON, District Judge.

Plaintiff Roland Cockfield, employed by defendant United Technologies Corp., Pratt & Whitney Division ("Pratt") from December 1964 until his termination on June 28, 1991, alleges Pratt fired him on account of his race in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. and not, as Pratt contends, because of violation of the company's rules. The Court has jurisdiction pursuant to 42 U.S.C. § 2000e-5(f). The matter was tried to the Court between January 20 and 22, 2004, and the following constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## I. Findings of Fact

### A. Background

Roland Cockfield, who is African American, was, at all times relevant to the present case, a resident of Connecticut. Pratt is a Connecticut corporation, organized and existing pursuant to the laws of Connecticut and duly authorized to conduct business therein. Pratt maintains a business at Aircraft Road, Middletown, Connecticut.

Pratt initially hired Cockfield in December 1964 as an entry-level machine operator. Sometime around 1969 or 1970, Cockfield moved into plant protection. In approximately July 1984, Pratt promoted Cockfield to the position of Senior Plant Protection Officer, which resulted in Cockfield assuming supervisory responsibilities. All of Cockfield's employment with Pratt was at Pratt's Middletown facility. As a Senior Plant Protection Officer, Cockfield's duties included protecting all of Pratt's facilities, contents and personnel, conducting site inspections to ensure proper fire protection, and ensuring adequate plant protection coverage.

Pratt's policies for its Plant Protection Department are contained in Pratt's Plant Protection Manual (the "Manual"). All of Pratt's Plant Protection Officers generally receive a copy of the Manual, and Cockfield did while employed. Pratt requires its Plant Protection Officers to learn, know, follow and apply the policies set forth in the Manual, including requirements that Plant Protection Officers operate on the basis of special rules, regulations and standards of personal conduct, performance and appearance.

Fred Jones was Supervisor of Protective Services from approximately 1989 until he retired in April 1999. In that position, he was Cockfield's supervisor. Jones had been an employee of Pratt since 1968, having worked at different times as an apparatus driver, fire lieutenant, shift supervisor, and his ultimate position as Supervisor of Protective Services. He participated in the decision to terminate Cockfield with two others: his boss Chris Walsh, personnel manager of Pratt's Middletown facility; and Dave McGrath, Pratt's manager of all plant protection whose office was in East Hartford. Jones had supervised Cockfield since 1984, and had never heard or received an allegation of Cockfield having been engaged in stealing. From 1989–1991, Jones gave Cockfield two performance-based raises. Also, Jones testified that Cockfield was doing a good job during the 1990–1991 time frame, that he executed good judgment on the job, and that his judgment was relied on by Jones. In 1991, there were six salaried employees working under Jones, three senior plant protection officers and three shift supervisors, of whom Cockfield was the sole African American.

## B. Events Leading Up to and Termination of Cockfield

Sometime in June 1991, an anonymous note was submitted to Pratt Vice President Bean, who in turn sent the note to Chris Walsh. The note states,

I would like to complain about a supervisor in the Middletown Plant Protection Department who is stealing food from the cafeteria here in building 10. Roland Cockfield comes here to eat dinner several times a week. He never pays for the meals and when supervisor Bill Schiffert spoke to him about it, he got very angry.

I followed him thru the line and when he skipped past the cash register, I told him to go back and pay for his food, he said "look mother fuccker (sic), you just mind your own fucken (sic) business". he has since harassed me on two separate occasions. He sometime (sic) comes here around 7:30 in the morning foor (sic) breakfast and does the same thing.

I think if he can gert (sic) away without paying for his meals, then we should all be allowed free meals. I have to wonder what else he isstealing (sic). I don't want to sign my name as he will continue to hasass (sic) me. He is a very nasty person.

Def.'s Ex. B. The cafeteria located in Building 10 was operated by ARA Services, an outside vendor providing food services to Pratt. Jones infrequently visited that cafeteria, approximately once per month, but never ate there. Cockfield ate breakfast and lunch there almost every day.

On June 17, 1991, Walsh had Jones come to his office and gave Jones the note. Notwithstanding his long term relationship with Cockfield, and Cockfield's good work record, Jones did not approach Cockfield to discuss the allegations or investigate the matter himself, but rather informed Walsh that the best way to handle the situation would be to have internal security investigate.

Jones next forwarded the note to internal security, specifically Robert Begley, the supervisor of Pratt's Internal Security Department,[1] and requested a formal investigation into the note's allegations. At trial, Jones testified that he requested the formal investigation for several reasons: the allegation in the note was about stealing food and therefore he envisioned a person entering the cafeteria and eating food without paying for it; he did not have adequate resources to perform an investigation; and he did not want individuals who knew Cockfield to be involved in an investigation.[2]

Begley met with Jones to get a description of Cockfield and find out where Cockfield ate lunch and generally about his routine. Jones showed Begley a picture of Cockfield and informed Begley that Cockfield had worked at Pratt for a long time. In addition, to help with the investigation, Begley got McGrath's approval to bring in an outside investigator unknown to the guards at Pratt's Middletown facility. This individual was an employee at Hamilton Standard named Phelps.

On June 26, 1991, at approximately 10:30 a.m., Cockfield drove up to a gate at the Middletown facility for the purpose of going to the cafeteria in Building 10. After obtaining clearance and beginning to move through the gate, Cockfield heard over his truck radio Jones making a call. Cockfield recognized Jones' voice but was not aware of the content of the message being given. He later learned that Jones through code had alerted internal security to Cockfield's presence and movement toward the cafeteria. Begley, on his way to supervise Cockfield, spoke with Jones. The content of this conversation was not clearly revealed by the testimony; in addition, the temporal relation between Jones' alerting internal security and his speaking to Begley is not clear. Jones did testify that he did not direct Begley how to carry out surveillance on Cockfield.

At approximately 10:55 a.m., Begley and Phelps met at the cafeteria in Building 10 to conduct surveillance on the cashier line. Edith Wiknik, an employee of ARA, was working as the cashier at the time.[3] Begley and Phelps observed Cockfield enter the cafeteria, get a tray, put a hotdog, roll, and cup of water on the tray, and proceed to Wiknik's cash register. Begley and Phelps got their own trays, placed beverages on them, and slid into line behind Cockfield. They observed Cockfield hand Wiknik a five dollar bill, Wiknik take the bill, remove five one dollar bills from the cash register, count and hand the bills to Cockfield, and then watched as Cockfield took the bills, walked away, and seated himself in the cafeteria to eat lunch. Cockfield did not count his change and did not appear nervous. Begley and Phelps could not see from their vantage point whether or not Wiknik had rung up anything on the cash register.[4]

1. Begley had formerly worked as a police officer for the town of Avon, Connecticut, and had extensive experience in positions related to corporate security.

2. Differences in Begley's version of his initial interactions with Jones are not material. Begley testified that after Jones requested the investigation, he spoke with McGrath who directed him to meet with Jones and that it was then when he met with Jones that Jones gave him the note. Begley then notified McGrath presumably about the contents of the note and his meeting with Jones and McGrath directed Begley to pursue the investigation.

3. Ms. Wiknik is now deceased.

4. Begley also testified that he and Phelps did not see Wiknik write anything down during the transaction.

At approximately 11:00 a.m., after finishing lunch, Cockfield left Building 10. Begley and Phelps followed him outside and confronted him. They identified themselves as internal security and asked whether Cockfield had been receiving an occasional free meal from the cafeteria. Cockfield reacted with surprise and responded that he had been. Begley and Phelps told Cockfield that he was not permitted to do that, to which Cockfield responded that he had never been told that receiving free food was not allowed. Begley and Phelps then asked whether Cockfield would be willing to give a statement, and Cockfield replied that he would do so. Begley and Phelps instructed Cockfield to return to work, which he did for a short period until called by Begley to give a statement. After Begley and Cockfield returned to internal security but before Cockfield gave a statement, Begley contacted Jones, telling him something of what had transpired and that he was in the process of taking Cockfield's statement and would also be gathering additional information.

During the interview, Begley and Phelps reiterated that Cockfield was not permitted to receive free lunches. When Cockfield queried why, they told him it was illegal. They also informed him that he did not need to receive free hot dogs because he was making sufficient income to afford to purchase them. Cockfield agreed but explained about his relationship with Wiknik, how he had helped her in the past and that, as a result and over his objection, Wiknik insisted on providing Cockfield with free lunches in gratitude, telling him that she had authorization to do so. The investigators admonished Cockfield that what he did "was a stupid thing to do;" Cockfield's response was "maybe it was a dumb thing to do." Finally, toward the end of the interrogation, Cockfield told Begley and Phelps that if what he had done was wrong, he would never do it again and that he never had any intention of harming Wiknik. Begley and Phelps replied "No, I guess you won't [do that again]." Tr. [Doc. # 117] at 54:1.

Cockfield's statements as taken down by Begley, which Begley read back to Cockfield and Cockfield signed after dictating and initialing some corrections, read as follows,

I, Roland Cockfield, am 49 years of age.... I have been employed by the P & W Business Unit for approximately 27 years and am presently a Senior Plant Protection Officer working under the supervision of Fred Jones.

I understand I am being interviewed in regard to an allegation that I have accepted free lunches from the P & W Middletown Building # 10 cafeteria. Specifically, it is alleged that on June 26, 1991, at approximately 10:55a.m., I was observed by Investigators Begley and Phelps receiving a free lunch (hot dog) at the Building # 10 cafeteria. I was observed giving the cashier a $5.00 bill to pay for the hotdog and receiving 5 single dollars in return.

On June 26, 1991, at approximately 10:55a.m., while in the Building # 10 cafeteria, I proceeded to select a hotdog as I walked thru the service line. I also took a cup of water. I then approached the cashier (Edith) and gave her a $5.00 bill to pay for my $1.50 hotdog. Edith returned 5 one dollar bills to me. I then sat down at the first table and ate my lunch. Approximately 20 minutes later, as I was exiting the cafeteria thru the kitchen, Investigator Begley stopped me. He explained how Internal Security had received complaints about my receiving free lunches. I admitted to both Investigators Begley and Phelps that I had just received a free lunch.

I have been receiving a free or reduced price lunches from Cafeteria # 10 for approximately 6 months. Sometimes Edith accepts my money for the meals and sometimes she returns all or part of the money to me.

I have never made any agreements with Edith in regard to free lunches—she has simply decided, on her own, to give me free lunches sometimes. She is a very nice person.

I am not aware of any other employees, including Fire/Security personnel, who have received free lunches.

I do not feel like I am stealing if the cashier wants to give me a free lunch. I did not try to conceal this activity. I have always gone to the cashier to pay. I have never skipped the cashier and just walked over to the table. However, at times when the cashier's line was long, I went to my table, left my tray there, and then returned to pay the cashier. At this time, I realize it was a dumb thing to do. I regret my actions. I would never want to get Edith in trouble.

Def.'s Ex. F–2 (Statement of Roland Cockfield dated 6/26/1991 at 11:25 a.m. and signed by Roland Cockfield on 6/26/1991 at 12:05 p.m.). Begley and Phelps then told Cockfield to go back to work and that Jones would get in contact with him. Less than one minute after leaving Begley and Phelps, as Cockfield left the building in which he was interrogated, he encountered Jones entering the building. Jones asked how Cockfied was doing, and Cockfield responded "pretty good." Jones replied, "I guess it's not going pretty good with you today." Cockfield queried his meaning, and Jones stated "Well not too good with you there, I guess, with the incident down at the Building 10 cafeteria."

Also on June 26, 1991, Begley and Phelps interviewed Wiknik. Wiknik's statement reads as follows:

I, Edith Wiknik, . . ., in the employ of ARA, give the following voluntary and true statement to Investigators Begley and Phelps, whom I know to be employed by Internal Security, Pratt and Whitney, of my own free will. No threats or promises have been made to me by anyone.

I, Edith Wiknik, am 61 years of age. . . . I have been employed as a Cashier for ARA for 15 years.

I understand I am being interviewed relative to any information I possess in regard to free lunches P & W Security Supervisor Roland Cockfield received from cafeteria # 10 in the P & W Middletown facility.

Presently, I am an ARA cashier at the P & W Middletown Building # 10 cafeteria. About 1½ years ago I was diagnosed as having liver cancer. Roland Cockfield had asked me about my illness. He was very nice to me, in fact, he even tried to get me a special parking permit. As a way of showing my appreciation to him, I would not accept any money from him for lunches and an occasional breakfast at the Building # 10 cafeteria. Roland would give me the money, however, I would return the same amount of money to him. For example, if he gave me a $5.00 bill to pay for his lunch, I would return 4 singles and 4 quarters to him. There was never any pre-arranged plan discussed between us on how I would give him the free meal. Again, Roland never asked for the free lunches, I gave them to him as a sign of my appreciation. I would actually ring the cost of the meal up on the register and, at the end of the day, I would balance the tape with my own money. Roland had no idea I was pay-

ing for his meals. I was actually going to talk to him about ending the free meals because an employee had complained about it. This practice of giving Roland a free lunch had only gone on for the past 1½ years.

Roland is the only employee I have given free lunches to. I am not aware of any other employees who have received free meals at our cafeteria.

I would like to note that sometimes Roland, because the cashier line was so long, would take his tray/meal to his table and then return to the register. Today, June 26, 1991, Roland came thru the cashier line with a hot dog and what appeared to be a soda. He gave me a $5.00 bill to pay for the $2.00 charge and I returned 5 single dollar bills to him. In other words, I gave him a free lunch. I sincerely regret my actions. I have always put my money into the register to balance Roland's free meals. He is a very nice man and I hope we do not get into trouble over this.

I, Edith Wiknik, have read the above statement consisting of 4 pages and the statement has been read to me by Investigator Begley.

Def.'s Ex. G–1 (Statement of Edith Wiknik dated 6/26/1991 at 1:00 p.m. and signed by Edith Wiknik at 1:35 p.m.).

It appears from Cockfield's testimony and Cockfield's and Wiknik's statements that much of the following description of their relationship which was the basis for the free meals was given to Begley and Phelps during their interrogation of Cockfield and Wiknik. *See e.g.* Tr. [Doc. # 117] at 47:6–49:2. The relationship developed sometime in January, 1991 when Cockfield began to help Wiknik with cafeteria tasks such as lifting heavy milk containers. Wiknik needed the help because she was suffering from liver cancer and her condition had left her frail and weak. However, Wiknik was a proud person and did not want to stay at home but desired to continue working and earning her income. After Cockfield found out about Wiknik's illness, he began to go out of his way to help her, in part because he knew from his father's bout with cancer what difficulty the disease can inflict upon the body. At some point during their relationship, Wiknik occasionally began to refuse Cockfield's offer of payment for a meal, saying, for example, "I told you lunch is on me" or "I told you you don't owe me anything, I'm doing this out of the goodness of my heart," and becoming offended when Cockfield would insist on paying for the meal. Sometimes Cockfield would pay by placing his payment near the cash register. Other times, he would take his food to his seat before returning to the cash register to tender payment.[5] Sometimes Wiknik would accept Cockfield's payment and sometimes she would refuse. The one constant was Cockfield always tendered payment. Jones was aware of Cockfield's relationship with Wiknik prior to the investigation. Cockfield had come into Jones' office to inform him that Wiknik was sick with liver

---

**5.** Plaintiff's witnesses Robert Graves, Robert Malcolm, and Billy Mitchell, all long-time Pratt employees, testified to various aspects of the way in which the cafeteria in Building 10 was run during the period from 1989 to 1991. The picture that emerged was that of an informal setting in which one or two workers would often shoulder responsibility for servicing the entire cafeteria. It was not unusual for individuals to take food, walk by the cashier, and return after eating to pay for their snack or meal. It was also not unusual for individuals to pay for small items such as coffee by simply putting their payment next to the cash register. The informal practices derived in part from the employees managing the cafeteria being tied up with various duties and thus being unavailable to attend the register for each and every customer.

cancer and to request Jones' help in obtaining a medical pass to allow Wiknik to park closer to the cafeteria in Building 10.

After taking Cockfield's and Wiknik's statements, Begley telephoned McGrath and sent both written statements to his office in East Hartford. Begley also contacted Jones sometime after taking Wiknik's statement, informing him of the content of her statement and indicating that he would next pursue taking Schiffert's statement. Next, Jones, Walsh, and Begley met to discuss the situation, after which Jones made the decision to suspend Cockfield. Jones testified that he based his decision on the two statements of Cockfield and Wiknik and particularly "the deception at the cash register" and the "theft."

Later in the afternoon of June 26, 1991 at around 2:00 p.m., Jones approached Cockfield at security headquarters and called him back to his office, where he told Cockfield he was being suspended indefinitely. Cockfield asked the basis of the suspension and Jones replied "for the incident in Building 10 cafeteria." Cockfield then asked why, given Jones' experience and knowledge of Cockfield and his work record, Jones had not just approached Cockfield and explained the problem instead of launching an internal investigation. Jones told Cockfield that, if the decision had been left to Jones, Jones would have followed that course of action but the anonymous note went to upper management and Jones had nothing to do with the investigation. Cockfield asked whether he could use the phone to telephone the vice president working with plant protection officers at the time, but Jones refused, informing Cockfield that he had no more privileges at Pratt because he was on suspension and directing him to clean out his locker, leave the premises, and wait for a call from Jones. Cockfield retrieved the personal belongings from his locker, and left the premises in a state of shock and disbelief over the suspension, believing that, when called, he would explain what happened and things would get straightened out.

Upon arriving at home, Cockfield telephoned McGrath, leaving a message requesting a return phone call. McGrath did not call back. The next morning, June 27, 1991, Cockfield reached McGrath, whom he had known since first entering the security department, and began to explain the prior day's events and asked for an update on the investigation about the incident in Building 10. McGrath told Cockfield that he did not know details but that, after all reports came in, he would call him.

Later on June 27, Begley took Schiffert's statement:

I, William Schiffert, am 48 years of age. . . . I have been employed by the P & W Business Unit for approximately 27 years and am presently a Manufacturing Support Supervisor working under the supervision of David Gray.

I understand I am being interviewed in regard to any knowledge I have regarding Security Supervisor Roland Cockfield receiving free lunches at cafeteria # 10.

Back in 1987 I observed several hourly employees enter thru the backdoor of cafeteria # 10, pick up coffee and donuts, and leave without paying for them. Edith, the cashier, would simply watch them walk by without paying. She would socialize with them as if they were friends with her. Other employees paid for their food. I spoke to Edith about this practice and she said she would address the situation. Prior to this incident, I had spoken to her about a salary person from Building # 150, John Gustaitus, who had been receiving free

lunches at cafeteria # 10. Edith spoke to Gustaitus the next day and the free lunches ended for him.

Also, during the summer of 1990, I observed Security Supervisor Roland Cockfield, on several occasions, walk past the cashier (Edith) without paying and sit down at the first table and eat his lunch, when he finished his lunch, he would then leave. He did not pay for his lunches. I talked to Edith about Cockfield's free lunches and she denied it. She said, "Oh no, he pays for his lunches." After my conversation with Edith, Cockfield changed his routine. Now he goes thru the line and hands Edith money. For example, if Roland's charge came to $2.31, he would give her a $5.00 bill and receive four (4) singles and four (4) quarters from her. This would give the appearance he was getting legitimate change from her. Sometimes the cash register would show "0" as she rang his order.

In March of 1991, I again observed Cockfield not pay for his lunch. I was sitting at the first table where Cockfield normally sits when I observed him give Edith a $5.00 bill and she returned the $5.00 bill to him. At the time, there was nobody behind him in line and he had a full meal on his tray. In fact, he sat down at the same table as me and said, "How are you doing?" I watched him place the $5.00 bill back into his pocket. Later, after lunch, I returned to the cafeteria and said to Edith, "I saw Roland not pay for his lunch today." She seemed very nervous but did not reply. I said, "I thought we were going to stop this." I then walked off. She was obviously very upset. Within 15 minutes of my conversation with Edith, Cockfield called to me while I was in my maintenance area. He said, "What's this I hear you are accusing me of not paying for my lunches. If you want we can go up to Personnel and talk about this." I told him I wasn't accusing him of anything. He mumbled something and walked off. Since that conversation I still have observed him taking free lunches. Also since my conversation with Cockfield, he has been very "cold" to me.

On June 26, 1991, at approximately 10:55a.m., while standing in the cafeteria # 10 cashier line, I observed Roland Cockfield standing directly behind me in line. After I paid for my order, I stayed there and observed Edith ring Cockfield's order for $2.00. He had a hotdog and beverage. It looked like he had a bill or bills crumbled up in his hand. He then handed the bill(s) to Edith who took the bill(s) and, after a slight delay, returned some bills to Cockfield. I also noticed Internal Security Investigator Begley along with another investigator standing in line, right next to Cockfield. I then exited the cafeteria.

Def.'s Ex. G–1 (Statement of William Schiffert dated 6/27/1991 at 10:25 a.m. and signed by William Schiffert on 6/27/1991 at 11:25 a.m.). Schiffert worked in the maintenance department as a supervisor but there was no explanation why, on June 26, 1991, Schiffert happened to be in the cashier line just ahead of Cockfield at precisely the time Begley and Phelps were just behind him during Cockfield's hotdog transaction. Neither Jones nor Begley testified that Schiffert was at all involved in the investigation of Cockfield's free lunches. In fact, Jones did not speak with Schiffert prior to terminating Cockfield. Jones did not know whether Schiffert had reported the other free food incidents contained in his statement, did not question Schiffert on whether he had failed to report them (Schiffert had an obligation as a supervisor to report theft), was unaware whether Walsh or McGrath questioned Schiffert on

these matters, and did not ask Schiffert why he had failed to report Cockfield's free lunches. Although Jones testified that he considered Schiffert's report of hourly workers getting free food and coffee stealing, he made no attempt to find out who the hourly workers were, and made no request of internal security to do an investigation. Jones also took no steps to generate an investigation on John Gustaitus and was not aware of any such investigation being requested or initiated by anyone. Begley also made no attempt to investigate John Gustaitus, because Schiffert's statement claimed that the lunches had ended for him.

After taking Schiffert's statement, Begley contacted Jones and relayed the contents. Begley also forwarded typed copies of all three statements to Jones. Jones decided to wait to make a decision on Cockfield's termination for an opportunity to meet with Walsh and McGrath. Apparently at this juncture, Cockfield telephoned Jones again and asked for an update on the Building 10 incident investigation; Jones replied that he was waiting for information from upper management. Cockfield asked for the reason supporting his suspension and Jones simply reiterated that he was waiting for upper management, saying "This is out of my hands, this is being handled on upper level, management level, upper management level."

Jones then had a telephone conference with Walsh and McGrath regarding Cockfield's situation. Both Walsh and McGrath knew Cockfield was African American and were aware how long Cockfield had worked for Pratt. Jones recalled little of this conversation at trial, but remembered that it lasted approximately one hour, that Begley was patched in through a speaker phone at some point, and that the three

reviewed the statements of Cockfield, Wiknik, and Schiffert. Jones also testified that the three identified ARA as the entity from which they believed Cockfield had stolen. At the end of the meeting, Walsh and McGrath asked Jones for his recommendation, Jones recommended termination and the other two agreed. The termination decision did not involve any review of Cockfield's past employment record, and neither Walsh nor McGrath directed Jones to undertake any further investigation.[6]

The next day, June 28, 1991, Cockfield again telephoned Jones. According to Cockfield, Jones told Cockfield he was still waiting to receive information from upper management and that he would call Cockfield back. A half hour later, Jones telephoned Cockfield to inform him that upper management had decided on termination. Cockfield said that he could not believe it and Jones said that that was the decision and asked Cockfield to turn in his Pratt clothing the following Monday.

At the time Cockfield returned to Pratt to turn in his clothing, badge, and keys, and to inquire on the status of his insurance and savings plans, he was not provided any written confirmation of his termination.

Three weeks passed and Cockfield, having received no official notification from Pratt, telephoned Jones and asked for official documentation of his termination for purposes of filing for unemployment compensation. Jones sent Cockfield a letter dated July 22, 1991, the body of which reads,

> This letter is to confirm your termination from Pratt & Whitney effective Friday, June 28, 1991, due to violations of Company rules.

6. There is no process in Pratt's policies regarding termination that allows a terminated salaried employee to appeal or address the termination.

Def.'s Ex. I. Cockfield never received a termination slip from Pratt. The first attorney who represented Cockfield in regard to the Building 10 incident requested Cockfield's personnel file, in which was included an "Employment Termination Record" dated July 1, 1991. The pink slip listed "Violations of Company Rules" as an explanation for his dismissal with the code 2.103 entered in a box labeled "Focal Pt. Pers. Dept. Use". The number 2.103 apparently represented some kind of code for theft. In the box labeled "rehire status," Cockfield's attendance was checked as excellent and general ability and attitude as good. The pink slip was signed by Jones.[7]

Also on July 1, 1991, Begley prepared a final report and submitted it to the personnel department, Jones, and McGrath. The report is titled "Theft from Cafeteria," and it reads:

### SYNOPSIS

An anonymous letter alleged that Cockfield was not paying for his lunches. An Internal Security surveillance confirmed the allegation. Cockfield, in a written statement, admitted not paying for his lunches.

### DETAILS

On June 17, 1991, P & W Middletown Plant Security Manager Fred Jones, ..., reported the receipt of an anonymous letter claiming Security Supervisor Roland Cockfield was not paying for his meals at the Building # 10 Cafeteria. The letter also indicated that Manufacturing Support Supervisor William Schiffert, ..., had spoken to Cockfield about the free meals, and as a result of the conversation, Cockfield became angry....

Schiffert stated that during the summer of 1990, he observed Cockfield, on several occasions, walk past the cashier at Cafeteria # 10 without paying for his lunch. According to Schiffert, ARA Cashier Edith Wiknik, ..., did not challenge Cockfield as he walked past her. Schiffert said he questioned Wiknik about Cockfield's free lunches and she claimed he paid for them. Schiffert further stated that after his conversation with Wiknik, Cockfield changed his routine. More recently, Cockfield gave Wiknik money at the register and received the same amount in return. Schiffert said that in March 1991, he observed Cockfield give a five dollar bill to Wiknik and she returned the same five dollar bill to him. Cockfield then sat down at a table near the cash register and ate his lunch. Schiffert said he approached Wiknik and stated, "I thought we were going to stop this." Wiknik made no comment, however, she appeared upset. Approximately 15 minutes later Cockfield approached him and said, "What's this I hear you are accusing me of not paying for my lunches." If you want we can go to Personnel and talk about this." Schiffert, who told Cockfield he had not accused him of anything, noted that Cockfield's free lunches have continued.

On June 26, 1991, at approximately 10:55a.m. Investigators Begley and Phelps observed Cockfield enter the Building # 10 Cafeteria. Cockfield placed a hotdog and beverage on his tray and proceeded to the cashier line.

---

7. In 13 years since his termination, no one from Pratt ever told Cockfield what company rule he supposedly violated by receiving free lunches from Wiknik. It was not until the trial testimony of Jones that he learned what Pratt rules defendant claimed he had violated. Cockfield testified that he hired legal counsel in the first place to learn what rule/s he had violated and to get his job back.

Investigators Begley and Phelps stood in line directly behind Cockfield. Cockfield approached Wiknik and handed her a partially folded five dollar bill. Wiknik, who appeared quite nervous, placed the five dollar bill in the cash drawer and pulled out four single dollar bills. She counted the four bills and, after a slight pause, took another single dollar bill from the cash drawer. She counted the five single dollar bills and handed them to Cockfield. He then sat down at the first table and ate his lunch. Upon finishing his lunch Cockfield exited via the kitchen door and, at that point, Investigator Begley confronted him as to what had just been observed. When specifically asked by Begley if he had just received a free lunch; five single dollar bills in return for the five dollar bill he had used to pay for his lunch, Cockfield replied, "Yes".

Cockfield was escorted to Internal Security where he provided a written statement admitting to having received free lunches at Cafeteria # 10 for approximately 6 months. Cockfield claimed he never solicited the free lunches, rather, it was Wiknik's decision to provide him with free lunches. Cockfield, who described Wiknik as a "very nice person", stated he is not aware of any other employees who have received free meals.

Upon interview, Wiknik confirmed that she had provided Cockfield with a free lunch on June 26, 1991, when she accepted a five dollar bill as payment for his lunch and then returned five single dollar bills to him. Wiknik explained how approximately 1½ years ago she was diagnosed as having liver cancer and, since that time, Cockfield has been very nice to her. For example, Cockfield tried to obtain a handicap parking permit for her. According to Wiknik, as a sign of gratitude to Cockfield, she gave him free lunches and an occasional free breakfast. She further explained how Cockfield would pay for the meal and she would ring the cost up on the register and then return the same amount of money to Cockfield. In order to balance at the end of the day, she would put her own money in the cash register. Wiknik said Cockfield had no idea she was actually paying for his meals. According to Wiknik, she was planning to stop Cockfield's free lunches because some employees had complained about the practice. Wiknik said no other employee received any free meals.

Def.'s Ex. D.

While Begley testified with confidence about his knowledge of what constituted theft, cross-examination focused on whether Cockfield's activity could be characterized as theft if Wiknik had permission to give away free food. Then, Begley testified that, as part of his investigation, he had checked with ARA management and been informed that Wiknik did not have permission to give out free food. Begley, however, was unable to point to any contemporaneous memorialization of this important part of his investigation, casting doubt on whether any such contact occurred.

Begley also testified that he did not credit Wiknik's statement that she paid for Cockfield's food. Schiffert, however, provided a statement of his observation that Wiknik had rung up Cockfield's order as $2.00 on June 26, 1991, corroborating in part Wiknik's account that she would ring up the order when Cockfield came through her line and pay the balance at the end of the day. Begley also claimed he investigated whether Wiknik paid for Cockfield's food by checking the teller tapes which showed nothing, but he omitted this important detail from his report.

## C. Theft by Bernard Cramer

Begley also testified at trial about his investigation of a white male named Bernard Cramer. In 1990, Cramer, a Vice President of Pratt, was found to have engaged in significant theft and embezzlement. *See* Def.'s Ex. BB (Report on Bernard F. Cramer by R.J. Begley and J.P. Mitchell, dated 10/25/1990). He stole wine from the executive dining room regularly for a year; he charged Pratt $540.00 for catering by ARA at his mother-in-law's funeral; he gave $2000 worth of Waterford crystal to a Pratt computer programmer to complete a project for his personal benefit; and he charged $87.38 to Pratt for a luncheon that was never held. *Id.* When interviewed initially, Cramer denied that he signed the charge slip for the $540.00 expense. Def. Ex. CC (Statement by Bernard Cramer, dated 10/22/1990 at 3:30 p.m., signed on 10/22/1990 at 6:25 p.m.). Investigator Begley had a Connecticut State Police handwriting examiner compare the signature on the charge slip to Cramer's known signature, and the examiner concluded that Cramer had, in fact, signed for the catering charge. Def. Ex. BB.

Ultimately, Cramer was fired from Pratt. It does not appear in the record that Jones, Walsh, or McGrath, the three potential decisionmakers in Cockfield's termination, were involved with the Cramer investigation or termination.[8]

## D. Testimony of Graves, Malcolm and Mitchell

Cockfield called three witnesses, Robert Graves, Robert Malcolm, and Billy Mitch-ell, all long-time Pratt employees, to testify about other employees receiving free food in the Building 10 cafeteria. Graves, who is white, testified that he received free food at times. He also recalled a pot of soup in the cafeteria during the 1990/1991 time frame from which workers would ladle out portions to themselves and then skip the line for the register. Malcolm observed plant personnel receiving free food from the vending machines in the cafeteria. Mitchell observed people receiving free items such as coffee and cookies. He testified that this occurred when the person running the cafeteria was busy in the back and would simply waive the person through or say, "don't worry about it." There was no evidence that the conduct reached the attention of the decisionmakers in Cockfield's case.

## E. Jones' Trial Explanation For Cockfield's Termination

Jones testified that he decided to terminate Cockfield based on specific policies of Pratt covering theft, poor judgment, and conduct unbecoming to a senior plant protection officer. He testified that his decision was based on the statements of Cockfield, Wiknik, and Schiffert and his conclusion that the June 26, 1991 hot dog transaction was a continuation of the activity described in Schiffert's statement, which he credited.

With respect to Cockfield's statement, Jones testified he factored into his termination decision the method of exchanging money (a "dishonest way of doing things"), Cockfield's admission that he received free or reduced price lunches for six months, Cockfield's lack of knowledge of anyone

---

8. Jones also testified regarding a pre-Cockfield termination investigation in which he was involved, regarding an employee who had taken copper from a Pratt facility during lunch, stashed it, picked it up after work, and ultimately attempted to sell it to one of Pratt's vendors. Given the flagrant conduct by Carmer and this employee which undisputedly constituted theft of Pratt property, these examples do not appear to have much relevance to the way Cockfield's circumstances were treated.

else receiving free meals, his disbelief that Cockfield would return to the cashier to pay on the occasions he walked by the cashier, and a belief that Cockfield's statement "...it was a dumb thing to do..." evinced consciousness of wrongdoing. Jones also testified that he did not believe Cockfield's estimation that the free lunches had been ongoing for six months because it conflicted with Schiffert's and Wiknik's estimations of a longer period.

Jones testified he relied on Wiknik's statements that Cockfield was not aware she paid for his lunches, which Jones interpreted to mean that Cockfield knew he was stealing, that she provided free lunches to Cockfield for one and a half years, that only Cockfield received the free lunches from her, the "deceptive" money exchange, and her regret for her actions. Jones did not credit Wiknik's account that Cockfield would sometimes would go directly to a table and then return to the register to pay for his meals, or that she would pay for Cockfield's meals at the end of the day by balancing the register from her own pocket. Jones testified that Schiffert's statement was a major reason for his disbelief of Wiknik, with the result that Jones credited Wiknik's statements insofar as they harmed Cockfield but not where they exonerated him.

To these facts, Jones stated he applied various Pratt rules. He pointed to the Manual:

GENERAL POLICY INFORMATION

Plant Protection personnel share with all employees of Pratt & Whitney, ..., in the benefits, opportunities and responsibilities of employment as outlined in "You and Your Company." In order to more effectively discharge its rather special responsibilities and functions, the Plant Protection Department must operate on the basis of special rules, regula-

tions and standards of personal conduct, performance and appearance.

CONDUCT AND ASSIGNMENTS

1. Qualifications
...The following is a listing of attributes which are considered desirable in Plant Protection personnel:

...

— Tact and courtesy
— Integrity
— Good Judgment

...

7. Conduct on the Job
Each member of Plant Protection is expected to develop and exhibit standards of behavior that reflect credit on Pratt & Whitney. Officers must be courteous, considerate and prompt in dealing with other employees, visitors and the public, and must conduct themselves in such a manner that the work of the Plant Protection Force is effectively accomplished.

Def.'s Ex. A at 1–2, 22. Jones testified that reflecting credit on Pratt was an important part of being a plant protection officer and that what he perceived as a higher standard, embodied by the Manual's reference to "special responsibilities ..." and "special rules," was an important factor in deciding to terminate Cockfield. Jones also pointed to what he perceived as Cockfield's violations of the "good judgment" and "integrity" provisions as a basis for his decision. He thought Cockfield had demonstrated a lack of integrity by engaging in an equal money exchange, exuding an indifferent attitude regarding receipt of free lunches, changing the interaction with Wiknik to an equal money exchange after Schiffert confronted Cockfield but not stopping his behavior, and not reporting Wiknik for theft in violation of Cockfield's obligation to do so. Jones also pointed to what he called conduct unbecoming of a plant protection officer—Cockfield's con-

fronting Schiffert. Jones admitted, however, that such violations could not provide a sufficient basis for terminating an employee, only a basis for lesser disciplinary action. In this regard, he admitted that Pratt had an informal disciplinary process pursuant to which a verbal warning was given, then a written employee memorandum, then another memorandum with a final warning and then possibly dismissal.

Jones thus claimed that Cockfield was terminated for his *theft* of meals, which Jones said was an "especially serious" offense for which termination as a first response was appropriate.[9] For support, Jones pointed to the company theft rule Cockfield supposedly violated by accepting free meals, which was contained in the Supervisor's Policy Guide (General Rules of Conduct) issued January 9, 1976 and revised June 20, 1989:

2.1 The following practices are strictly forbidden:

. . . . .

   f. THEFT -

   — Stealing or having in an employee's possession without proper authority tools, materials, blue-

prints, or other property of the company, or of other employees,

   — Attempting to remove packages or parcels from Company premises without presenting a security pass to the security officer which has been duly signed by the supervisor.

Def.'s Ex. X at 1–2. Jones admitted that the rule does not say that the receipt of free lunches from the cafeteria is forbidden or that the receipt of free lunches constitutes theft. He conceded that if no property interest of United Technologies was involved or if Wiknik had authority from ARA to provide free meals then there was no theft. He testified that he assumed the meals were stolen because Wiknik was merely a cashier and therefore did not have the authority to give away ARA's food, and he believed that, if she had such authority, she would not have needed to engage in the equal money exchange with Cockfield.

## II. Conclusions of Law

### A. Title VII Framework

█ As the parties agree, this Title VII employment discrimination case should be

---

9. The informal progressive discipline system Jones conceded existed was not required. A portion of Pratt's Supervisor's Policy Guide (Discipline), which was issued January 9, 1976 and revised May 15, 1986, reads:

*DISCIPLINE*

  I. *PURPOSE*

The purpose of disciplinary action is to cause undesirable behavior of people to change to reflect desirable standards of conduct. The concept of maintaining discipline involves the supervisor taking action which directs, molds, and strengthens acceptable behavior and is corrective rather than punitive.

Pratt & Whitney has always maintained strict discipline in those areas of conduct in which violations could cause harm to others. This policy has been quite successful considering the size of the work force.

However, there is no automatic or "cookbook" formula for discipline. In situations involving problems in such areas as job performance, use of working time, or attendance, the supervisor must examine each case in the light of the individual circumstances and the total job environment. Whatever action is taken, the goal of discipline should be a satisfied and productive work force.

The determination and implementation of appropriate employee discipline is a matter of extreme importance. For this reason, the Personnel Support Office is available to *assist supervision in arriving at corrective* measures which will be consistent with company policy and equitable to the employee, his or her associates, management, and the public.

Def. Ex. W.

analyzed under the familiar *McDonnell Douglas/Burdine* three prong burden-shifting framework. Under that framework, Cockfield first must establish a *prima facie* case of discrimination on account of race. *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2 Cir.2000). To do so, Cockfield must prove: (1) membership in a protected class; (2) qualification for his position; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination on the basis of membership in the protected class. *See e.g., McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir.2000). The first three elements are conceded here. Cockfield is African American, was qualified for the position of senior plant protection officer, and was terminated. No one particular type of proof is required to satisfy the fourth element, rather it may take a variety of forms, *see Abdu–Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466–68 (2d Cir.2001), *Texas Dep't of Comm. Affairs v. Burdine*, 450 U.S. 248, 253–54 and n. 6, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), *McDonnell Douglas*, 411 U.S. at 802 n. 13, 93 S.Ct. 1817, including showing that the employer treated the plaintiff less favorably than co-employees outside plaintiff's protected class who were subject to the same disciplinary standards and engaged in comparable conduct, *see Graham*, 230 F.3d at 38–40.

Such proof shifts the burden to defendant "to produce evidence that the plaintiff was [terminated] for a legitimate, non-discriminatory reason. This burden is one of production, not persuasion; it can involve no credibility assessment." *Reeves v. Sanderson Plumbing*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (internal citations, quotations, and alterations omitted). It is satisfied if the proffered evidence " 'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.' " *Schnabel v. Abramson*, 232 F.3d 83, 88 (2d Cir.2000) (*quoting St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)).

■ If Pratt articulates a race-neutral reason for Cockfield's termination—theft—Cockfield may "come forward with evidence that the defendant's proffered, non-discriminatory reason is a mere pretext for actual discrimination." *Weinstock*, 224 F.3d at 42. Proof of pretext is not required to prove race discrimination. *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097 ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination...."); *see also Zimmermann v. Associates First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001) ("*Reeves* instructed that the combination of evidence establishing a *prima facie* case and evidence showing that a proffered explanation was pretextual is neither always to be deemed sufficient nor always to be deemed insufficient.").

In other words, an employee does not prevail any time the trier of fact rejects the employer's asserted legitimate, non-discriminatory reasons for terminating an employee. *Hicks*, 509 U.S. at 509, 113 S.Ct. 2742. It is paramount to remember when applying the *McDonnell Douglas/Burdine* framework that "[a]lthough intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097 (quotation omitted); *see Schnabel*, 232 F.3d at 88 n. 2. This larger consideration leads the Court

to conclude that plaintiff has not met his burden of showing that defendants discriminated against him on the basis of race in violation of Title VII.

## B. Analysis

■ The Court denied defendant's motion for summary judgment on the proffer that there would be testimony that defendant had fired, then reinstated a white employee who had stolen cafeteria food. This testimony was not offered. Instead, there was only Graves's testimony that he and others had received free food from the cafeteria. Thus it is doubtful that Cockfield has met the burden of his *prima facie* case. Even assuming he has, and finding, as the Court does, that defendant's articulated legitimate nondiscriminatory reason for firing Cockfield was pretextual, the Court finds that Cockfield has not met his ultimate burden of showing that he was fired because of his race.

### 1. Legitimate Nondiscriminatory Reason

Jones and Pratt offered no contemporaneous memorialization of the decision making process that Jones, Walsh, and McGrath engaged in when deciding to terminate Cockfield—not even, for example, a note to Cockfield's personnel file with a notation of the specific company rules Cockfield allegedly violated. While, at Cockfield's prompting, Jones sent Cockfield a letter dated July 22, 1991, in which he generically stated that Cockfield's termination was "due to violations of Company rules," neither Jones nor anyone else from Pratt before trial ever informed Cockfield of, or otherwise identified, the specific rules he allegedly violated. The absence of contemporaneous evidence contrasts with the different reality Pratt attempted to demonstrate at trial, with

Jones citing company rules by chapter and verse.

Jones essentially admitted that the rule against theft, which was supposed to form the triggering basis for Cockfield's termination, did not actually prohibit Cockfield's conduct, and that, without assuming both that Wiknik did not balance the register and did not have permission to give away free meals—two facts not established by the investigation prior to Cockfield's termination—Cockfield could not be said to have stolen. Moreover, Jones admitted that the rule did not cover property interests of ARA but only those of Pratt, and this admission, considered in conjunction with Jones' testimony that he, Walsh, and McGrath had identified ARA's property as what had been stolen in the crucial post-investigation termination decision meeting, shows recognition that Pratt's rule against theft did not cover Cockfield's conduct.

Second, Jones' testimony regarding his review of various items from the statements of Cockfield, Wiknik, and Schiffert is suspiciously selective. He accepted the statement of Schiffert, an individual he knew only in passing, over both Cockfield and Wiknik, notwithstanding that he had known Cockfield to be a good worker for many years, had never known him to be involved with stealing, and had never heard any allegation of theft against him. He disbelieved Wiknik's statement that she balanced the register and paid for Cockfield's lunch from her own pocket, notwithstanding Schiffert's observation that she had in fact rung up $2.00 on her register on June 26, 1991 when Begley and Phelps observed the equal money exchange between Wiknik and Cockfield. Jones says he believed Schiffert's statement that Cockfield would occasionally take food from the cafeteria and walk by the register without paying, giving no credit to Cockfield's explanations.

In addition, faced with Schiffert's report of "hourly workers" and John Gustaitus engaging in conduct Jones considered stealing, Jones took no action. Begley explained the lack of action on the basis that Schiffert stated that Gustaitus' free meals had ended. Yet if the same conduct was sufficiently serious to fire a 27–year employee with a good employment record, surely even Gustaitus' discontinued stealing would have merited some disciplinary attention.

Similarly, Jones' statement that he considered important in reaching a decision to fire Cockfield the fact that Cockfield did not fulfill his duty to report Wiknik's "theft" begs the question why Jones took no action against Schiffert, a supervisor with identical obligation to ferret out "theft," and who clearly had not timely reported the various "thefts" of cafeteria food memorialized in his statement. Jones in fact took no action whatsoever in regard to Schiffert's lapse, including, for example, any attempt to determine whether Schiffert had timely reported the alleged thefts.

Finally, Jones' repeated statements to Cockfield that upper management had forced Jones' hand and Jones had nothing to do with the investigation or ultimate termination decision, when in fact Jones testified that he instigated the investigation and ultimately decided to fire Cockfield, demonstrate that Jones was not forthcoming about the true process by which the termination decision was made.

Taken together, this evidence leads the Court to conclude that Pratt's espoused legitimate, nondiscriminatory reason for firing Cockfield—violations of the company no-theft rules—was pretextual. Pratt had not examined its own company policies at the time it fired Cockfield, and Jones' actions with respect to John Gustaitus demonstrate that even after Jones became aware of the fact that other employees were obtaining free meals, Jones did not consider the issue sufficiently important to further investigate.

## 2. Evidence of Race Discrimination Against Cockfield

Notwithstanding this proof of pretext, Cockfield has failed to meet his ultimate burden of showing that the real reason for Pratt's actions was race-based animus. Cockfield proffered no evidence that similarly-situated non-black employees were treated differently than he was.

First, Cockfield provided no evidence that the decisionmakers on his case (Jones, Walsh and McGrath) knew, before they began investigating him, that anyone except Cockfield had ever obtained free meals from the Building 10 cafeteria. Graves, who is white, testified that he had received free food, and he testified that other workers also had gotten free soup from a communal pot. However, Graves did not state whether he or anyone else reported these occurrences to Jones, Walsh or McGrath. Similarly, Malcolm testified that he had observed plant personnel getting free food from vending machines, but he did not testify that the three individuals in charge of Cockfield's case ever knew or had reason to know that other employees were taking that food. Mitchell also testified that other, unspecified, individuals had gotten free coffee and cookies from the cafeteria, but again he did not say that he or anyone else ever brought this to the attention of Jones, Walsh or McGrath. Finally, Cockfield testified, as well, that he knew of other people of unspecified race receiving free meals from the Building 10 cafeteria, but he had claimed in his written statement that he did not know of anyone else doing so because he did not want to get people in trouble. Thus Cockfield's own statement

indicates an intention to conceal the pattern of receiving free food on the part of Pratt employees from Pratt management. If the decisionmakers within Pratt management—namely Jones, Walsh and McGrath—did not know that other employees aside from Cockfield ever received free food from the cafeteria, then they could not be said to have chosen to discipline Cockfield while refusing to discipline other employees who had taken the same actions.

More importantly, neither Graves, Malcolm, Mitchell, nor Cockfield identified the race of the other, unnamed individuals who were getting free food from the Building 10 cafeteria and vending machines during the 1990/1991 period. While under Title VII Cockfield could meet his ultimate burden with many types of evidence, his theory of the case was that he was treated differently from similarly-situated non-black employees. Therefore, under this theory, he needed to establish that there were non-black individuals getting away with eating free food from the cafeteria, without discipline (or without such serious discipline) from Pratt, while he was fired for doing so. However, Cockfield presented no such evidence at trial.

Cockfield's evidence about thefts committed by Bernard Cramer, a white employee, does not ultimately weigh in his favor. The evidence showed that Pratt undertook a more thorough investigation in Cramer's case, even to the extent of hiring a handwriting expert from the Connecticut State Police. While Cramer was more thoroughly investigated, that is consistent with the extensive nature of his theft, his initial denial, and his position as a company vice president; he was clearly differently situated from Cockfield, and none of the decisionmakers involved with Cockfield's case (Jones, Walsh, and McGrath), were involved in Cramer's case.

Thus Cramer's circumstances cannot show that those particular decisionmakers treated Cockfield less favorably than a similarly situated white employee who stole from the company.

In the larger picture, while defendant's record of treatment of a long term employee is indeed shabby and disingenuous, the Court has no basis for concluding that race played a determinative role in Pratt's employment actions.

## III. Conclusion

As set forth above, the Court has concluded that plaintiff has not proved that defendant violated Title VII of the Civil Rights Act of 1964, and therefore judgment is entered in favor of defendant. The Clerk is directed to close this case.

IT IS SO ORDERED.