**Athena WAGNER, Plaintiff**

v.

**State of CONNECTICUT DEP'T. OF CORRECTION, et al., Defendants.**

**No. 3:06–cv–476(CFD).**

United States District Court, D. Connecticut.

Feb. 12, 2009.

Court, it need not decide the issue.

Cynthia Renee Jennings, Cynthia R. Jennings, Esq., Windsor, CT, for Plaintiff.

Maria A. Santos, Jane B. Emons, Attorney General's Office, Hartford, CT, for Defendants.

## RULING ON MOTION FOR SUMMARY JUDGMENT

CHRISTOPHER F. DRONEY, District Judge.

The plaintiff, Athena Wagner, brought this action against her employer, the Connecticut Department of Correction ("DOC") and seven DOC employees: Commissioner Theresa Lantz, Deputy Warden Wayne Chowinski, Affirmative Action Officer Joseph Civatello, Lieutenant Richard Blanc, Lieutenant Robert Guerin, Lieutenant Robert Jinks,. and Lieutenant James Watson. Wagner alleges that the defendants subjected her to race and gender discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Connecticut Fair Employment Practices Act ("CFE-PA"), Conn. Gen.Stat. § 46a–60 (a)(1), (4); 42 U.S.C. § 1981 "as secured by Section 1983"; and the Fourteenth Amendment of the United States Constitution,[1] and to retaliation. Wagner also claims that the defendants violated her due process rights. She is seeking damages, a declaratory judgment, and injunctive relief. Pending is the defendant's motion for summary judgment. For the following reasons, that motion is granted.

## I. Background [2]

Wagner is a black female who began work as a Correctional Officer ("CO") for the DOC in 1997. She was terminated on February 17, 2006 for excessive absenteeism.

### A. DOC "Dependability" Policy

At the time she was hired, Wagner was provided a copy of DOC Administrative Directive 2.11 ("AD 2.11") concerning "employee dependability." AD 2.11 defines an "Occasion of Absence" as a continuous period of absence for any reason other than a scheduled vacation.[3]

AD 2.11 calls for review of an employee's "dependability" after excessive absences, even if the absences are authorized. Nine occasions of absence in a twelve month period may result in an unsatisfactory performance rating under the policy. Two unsatisfactory performance ratings may then result in termination of employment.

The DOC provides employees with separate banks of leave time for illness, vacation, personal leave, and holidays. An employee who is unable to report for duty due to illness, but has exhausted all sick leave accruals, may use other leave accruals or be granted authorized leave without pay if the employee provides a medical certificate within forty-eight hours of re-

---

1. At oral argument, plaintiff withdrew her equal protection "class of one" claim in light of *Engquist v. Oregon Dept. of Agr.,* —— U.S. ——, 128 S.Ct. 2146, 2148–49, 170 L.Ed.2d 975 (2008).

2. The following facts are taken from the parties' Local Rule 56(a) statements, summary judgment briefs, and other evidence submit-

ted by the parties. They are undisputed unless otherwise indicated.

3. However, if the reason for absence changes during a period of continuous absence, that period is counted as more than one "Occasion of Absence."

turning to work. Otherwise the employee is charged with unauthorized leave. AD 2.11 calls for progressive discipline after each unauthorized absence, culminating in dismissal after five such absences.

### B. *Wagner's Service in the Waterbury Community Enforcement Unit*

In September 1999, Wagner was temporarily transferred to work in the Waterbury Community Enforcement Unit and awarded temporary service in a higher class as a "CO First Class." In Waterbury, Wagner worked under Defendant Lt. Blanc. On November 20, 2000, Wagner filed an incident report at Lt. Blanc's direction describing an incident in which she left the Waterbury office during her shift to have dinner at the Bridgeport Community Enforcement Unit. In the Report, Wagner claimed that Lt. Blanc held her to a different standard than other employees and made "derogatory, discriminatory remarks" about her and others.[4]

On December 11, 2000, the DOC notified Wagner that she would be removed from the Waterbury Community Enforcement Unit and returned to her previous position. According to the DOC, it removed her because it felt that she required "a higher level of supervision" than it could provide in the Community Enforcement position. Wagner subsequently applied to be transferred to DOC facilities in Cheshire or Wethersfield and repeatedly applied to return to the Community Correction position. On July 13, 2001,

Wagner was notified that her request to transfer to Cheshire had been accepted, and on September 21, 2001 she began work at Cheshire.

### C. *Wagner's Service at Cheshire*

Between 2001 and 2003, Wagner had a number of unauthorized absences or occasions when she reported absent due to illness, but did not have accrued sick leave to cover the absence. These absences resulted in informal counseling, two written reprimands, and a one day suspension.[5]

At some point in 2004, Lt. Blanc was transferred to Cheshire, but Wagner and Lt. Blanc did not work together there. In May 2004, Wagner filed a complaint with the DOC's Affirmative Action Unit concerning Lt. Blanc's transfer.

Also in 2004, Wagner's absences escalated. In September 2004, Wagner received a performance appraisal indicating that she was "fully successful" in all areas reviewed, except dependability. In this area, Wagner was rated "satisfactory" because of "eight sick occasions, using 13 sick days." Wagner was warned that she needed "to improve unscheduled sick time use." The appraisal also noted that Wagner had received a written reprimand for losing her operational keys.

#### 1. *Occasions of Absence after September 2004*

Between September 2004 and August 2005, Wagner had more than fourteen Occasions of Absence. On May 19, 2005 after

---

**4.** In particular, Wagner reported a June 2000 incident in which Lt. Blanc allegedly said "I wasn't about to send two women for a potentially dangerous inmate." Wagner also reported that Lt. Blanc suggested that another African American employee only knew the "bad section" of Hartford and not other areas of the city. Finally, Wagner reported that Lt. Blanc referred to another employee as "the Jew."

**5.** Although the evidence is somewhat unclear, Wagner seems to claim that she objected to this discipline by filing a grievance. In particular, Wagner seems to argue that she was charged with unauthorized absences because of record keeping problems on the part of the DOC, that her position was substantiated through the grievance process, and that the discipline was withdrawn.

receiving informal and formal counseling, Wagner was notified that she had accrued thirteen Occasions of Absence in a twelve month period and that she would receive an unsatisfactory performance appraisal if she had another unscheduled absence before August 31, 2005.[6] Wagner had another Occasion of Absence, and in October 2005, she received an unsatisfactory performance appraisal.

### 2. *Tardiness*

On February 12, 2005, Wagner received a Notice of Tardiness for reporting sick less than one hour before the start of her shift. This incident resulted in Formal Counseling. Wagner filed an incident report claiming that Defendant Lt. Jinks was "harassing [her] with numerous bogus 2.11 issues"[7] and that the "notice of tardiness" was false.

### 3. *Unauthorized Leave*

Between December 2004 and November 2005, Wagner was reported for unauthorized leave on six occasions: December 31, 2004, January 16, 2005, January 27, 2005, March 14, 2005, May 18, 2005, and November 12, 2005. Wagner received a Notice of Warning, a Written Reprimand, a one day suspension, and a five day suspension because of five of these absences.[8]

---

**6.** Wagner claims that two of these Occasions of Absence should have been treated as a single Occasion of Absence because they related to the same underlying event.

**7.** Wagner has not presented evidence that she was at work on any of the days she was charged with being absent, and has not presented evidence that she had sufficient accrued sick leave to cover these days, that she was permitted to substitute other leave to cover these days, or that an application to substitute other leave was denied in violation of DOC policy.

**8.** Pre-disciplinary hearings were held before the reprimand and each suspension.

In May 2005, Wagner filed an incident report concerning "2.11 issues." In this Incident Report, Wagner seems to argue that there were extenuating circumstances behind her May 18, 2005 absence, and that she should have been provided an opportunity to use "Emergency Personal Leave" or a vacation day.[9]

On November 12, 2005, Wagner had another unexcused absence, and on December 12, 2005, a predisciplinary hearing was convened. Wagner submitted a list of "mitigating factors" in which she argued that she should have had a remaining day of accrued sick leave on November 12, that she provided medical documentation to substantiate her absence on December 31, 2004, that she should have been permitted authorized leave on May 18, 2005, and that she had credit to cover parts of other days treated as unauthorized absences.

Following the hearing, the Director of Labor Relations, Correctional Personnel Director, Deputy Commissioner of Operations, and the Commissioner of the DOC unanimously decided to offer Wagner a "last chance" stipulation in lieu of terminating her employment. Wagner rejected the last chance agreement and was terminated.

Wagner grieved her termination through her union. Wagner was offered

---

**9.** On May 16, 2005, Wagner took another DOC officer to the emergency room because of chest pains. According to Wagner, he was admitted and underwent emergency surgery. Wagner was absent May 16 through May 18. On May 17, she called in and was permitted to take a vacation day. On May 18, she requested permission to use vacation time in lieu of sick leave for May 16 and 17, and authorized leave without pay for May 18. Her request was granted as to May 16, but denied as to May 17 and 18. However, because her absence on May 17 was a pre-approved vacation day, May 17 was not treated as an unauthorized absence.

stipulated agreements several more times throughout the grievance process, but rejected each agreement. According to Wagner, the terms of the agreements were unacceptable to her. However, neither party has presented these agreements to the Court.

Following binding arbitration, Wagner was reinstated. The arbitrator appears to have found that Wagner was terminated in accordance with AD 2.11 because she had five occasions of absence.[10] The arbitrator also found, however, that another female DOC employee was treated dissimilarly from Wagner because she was not terminated after having been absent fifty-two days. The arbitrator did not take note of the difference in the way AD 2.11 treats numbers of days absent from occasions of absence.[11] He surmised that the difference "may well be explained by the fact that various superiors are approaching this problem in a variety of very different ways." Beyond this, the arbitration opinion is of no value. There is no indication from the opinion that the arbitrator believed the dissimilarity between Wagner's and the comparator's discipline was due to Wagner's race.[12] Wagner has since returned to work, and, in accordance with the arbitrator's order, the period between her termination and her reinstatement has been treated as a suspension.

Wagner also claims that she was denied training and promotions because of her disciplinary record.

### D. CHRO Complaints

Wagner filed complaints with the Connecticut Commission on Human Rights and Opportunities (CHRO) on April 29, 2005 and March 23, 2006. On October 24, 2005, Wagner received a "right to sue" letter notifying her that the CHRO was releasing its jurisdiction over the complaints she raised in her first complaint. She filed this suit on March 28, 2006.

### II. Summary Judgment Standard

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. See Fed. R.Civ.P. 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)); accord *Miner v. Glens Falls*, 999 F.2d 655, 661 (2d Cir.1993). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

Because this is a discrimination case where intent and state of mind are in dispute, summary judgment is ordinarily inappropriate. *Carlton v. Mystic Transp.*, 202 F.3d 129 (2d Cir.2000). "The summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid mo-

---

**10.** The arbitrator erroneously concluded that Wagner was charged with unauthorized leave on May 16 and 17.

**11.** The comparator's fifty-two days absent were over only three occasions of absence. This employee was given a one day suspension after her third period of unauthorized leave, as called for in AD 2.11.

**12.** This comparator was also African American.

tion." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d. Cir.1985). A plaintiff may not rely on conclusory statements or mere contentions that the evidence in support of summary judgment is not credible. *Ying Jing Gan v. City of New York*, 996 F.2d 522, 532 (2d Cir.1993); *Henry v. Daytop Village, Inc.*, 42 F.3d 89, 97 (2d Cir.1994) ("The plaintiff must adduce evidence consisting of more than mere conclusory or unsubstantiated statements."). Similarly, a plaintiff, as the nonmovant, may not rest "upon the mere allegations or denials" in its complaint to demonstrate the existence of a genuine issue of material fact. Fed.R.Civ.P. 56(e). Therefore, after discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

### III. *Sovereign Immunity*

#### A. *CFEPA*

■ Wagner brought claims under CFEPA § 46a–60(a)(1) and (4) against all defendants. Wagner's CFEPA claims against the DOC are barred by state sovereign immunity because Connecticut has not consented to suit in federal court under CFEPA. *See Feingold v. New York*, 366 F.3d 138, 149 (2d Cir.2004); *Vaden v. Connecticut*, 557 F.Supp.2d 279, 289 (D.Conn.2008). Under CFEPA, the State has waived its immunity only as to cases brought in the Connecticut Superior Court. The statute provides:

> Any person claiming to be aggrieved by a violation of any provision of sections 46a–70 to 46a–78, in-inclusive, may petition the superior court for appropriate relief and said court shall have the power to grant such relief, by injunction or otherwise, as it deems just and suitable.

Conn. Gen.Stat. § 46a–99. "A state does not consent to suit in federal court by consenting to suit in the courts of its own creation." *Smith v. Reeves*, 178 U.S. 436, 441–445, 20 S.Ct. 919, 44 L.Ed. 1140 (1900); *see also Walker v. State of Conn.*, 106 F.Supp.2d 364, 370 (D.Conn.2000) ("Summary judgment will be granted on the CFEPA claims as to the State and all Defendants in both their individual and official capacities, as this Court lacks jurisdiction over the parties based on the clear reading of the statute.").

#### B. *42 U.S.C. §§ 1981 & 1983*

■ Wagner has sued all of the defendants under Section 1981 "as secured through Section 1983." Section 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981. In *Jett v. Dallas Independent School District*, the Supreme Court held that "the express 'action at law' provided by § 1983 for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws,' provides the exclusive federal damages remedy for the violation of the rights guaranteed by § 1981 when the claim is pressed against a state actor." 491 U.S. 701, 735, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989); *see also Anderson v. Conboy*, 156 F.3d 167, 176 n. 17 (2d Cir.1998) (citing *Jett*, 491 U.S. at 733, 109 S.Ct. 2702).

■ As a cause of action pursuant to 42 U.S.C. § 1983, Wagner's claims against

the DOC and the individual defendants in their official capacity, except to the extent they seek prospective injunctive relief, are barred by the doctrine of sovereign immunity. *See Quern v. Jordan,* 440 U.S. 332, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (holding that Section 1983 claims against states are not permitted absent the state's consent); *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). In order to be subject to suit in federal court, a state must expressly and unambiguously waive its sovereign immunity, or Congress must clearly and unmistakably express its intention to abrogate the immunity in the language of the particular statute. *Port Authority Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 304–05, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990). Congress has not abrogated the state's immunity from suit under 42 U.S.C. §§ 1981 or 1983, *see, e.g., Daisernia v. New York,* 582 F.Supp. 792, 799 (N.D.N.Y.1984), and Connecticut has not waived its sovereign immunity under those statutes, *Banerjee v. Roberts,* 641 F.Supp. 1093, 1098 (D.Conn.1986).

To the extent that Wagner brings claims pursuant to Section 1983 for violations of her rights to Equal Protection and Due Process, they are also barred by the Eleventh Amendment as to the DOC and as to the individual defendants in their official capacities, except to the extent she seeks prospective injunctive relief. *See Quern,* 440 U.S. at 332, 99 S.Ct. 1139; *Pennhurst,* 465 U.S. at 100, 104 S.Ct. 900; *Smith v. Conn. Dep't. of Correction,* Civ. No. 3:03–CV–00386 (AWT), 2007 WL 274532, at *1 (D.Conn. Jan. 29, 2007); *Longshore–Pizer v. Connecticut,* Civ. No. 3:04–CV–1601 (JCH), 2005 WL 2253603, at *2–3 (D.Conn. Sept. 13, 2005).

## IV. *Gender- and Race–Based Discrimination*

Wagner claims race- and gender-based discrimination in violation of Title VII, CFEPA, 42 U.S.C. § 1981, and the Equal Protection Clause of the Fourteenth Amendment. The same standards apply to evaluating each claim. *See Feingold,* 366 F.3d at 159 ("The elements of [Equal Protection] are generally the same as the elements of [Title VII] and the two must stand or fall together."); *Demoret v. Zegarelli,* 451 F.3d 140, 153 (2d Cir.2006) (same); *Levy v. Comm'n on Human Rights & Opportunities,* 236 Conn. 96, 671 A.2d 349, 355 (Conn.1996) (CFEPA).

### A. *Disparate Treatment*

■ To establish a prima facie case of discriminatory treatment based on an adverse job action a plaintiff must show "1) that he belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Feingold,* 366 F.3d at 152. "A plaintiff may raise such an inference by showing that the employer subjected him to disparate treatment, that is, treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir.2000). The Second Circuit has characterized the evidence necessary for the plaintiff to satisfy this initial burden as "minimal" and "de minimis." *See Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 76 (2d Cir.2005); *Zimmermann v. Assocs. First Capital Corp.,* 251 F.3d 376, 381 (2d Cir.2001).

■ Once a plaintiff has established a prima facie case, the defendant must then articulate "a legitimate, non-discriminatory reason for" the adverse employment action. *Graham,* 230 F.3d at 38. If they are able to do so, "the burden shifts back to

the plaintiff to prove that discrimination was the real reason for the employment action." *Id.*

There is no dispute that Wagner is a member of a protected class and suffered adverse employment actions in the form of warnings, reprimands, and suspensions (including the period of time from her termination through her reinstatement). Wagner seeks to establish an inference of discriminatory intent by presenting comparators she claims were similarly situated but treated differently.[13]

■■■ Whether comparators are similarly situated "requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." *Id.* at 40 (citing *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20 (1st Cir.1999) (explaining that "[r]easonableness is the touchstone" and recognizing that "the plaintiff's case and the comparison cases ... need not be perfect replicas")). Relevant factors include "(1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Graham*, 230 F.3d at 40. "The determination that two acts are of comparable seriousness requires—in addition to an examination of the acts—an examination of the context and surrounding circumstances in which those acts are evaluated." *Id.* at 40; *see also Mutts v. Southern CT State University*, No. 3:04–CV–1104 (CFD), 2007 WL 2688871, at *5 (D.Conn. Sept. 12, 2007).

Wagner has identified six possible comparators: Officer Frankie Graham, a Hispanic male; Officer Kenneth Lane, a white male;[14] Officer Jeffrey Riker, a white male; Officer Anival Betancourt, a Hispanic male; Officer MaryAnn Salerno, a white female; and Officer Andrew LeClerc, a white male.[15] According to Wagner, Officers Graham, Lane, and Riker violated AD 2.11. Officers Betancourt, Salerno, and LeClerc committed off-duty misconduct.

In July 2000, Officer Graham received a written warning for being absent without accrued leave time to cover the absence. In March 2001, Officer Graham was issued a written reprimand after he was absent on December 18, 2000 without "enough accrued vacation time on the books." In June 2001, Officer Graham was issued a second written reprimand because he "exhausted his sick family leave time on May 3, 2001." Officer Graham was warned that "[t]he quantity of these exhaustions of leave reflect a pattern on your part and could have resulted in a more stringent level of discipline ... however, it is apparent that, due to an administrative over-

**13.** Wagner also presented evidence that Lt. Blanc made race- and gender-based comments in the Waterbury Community Enforcement Unit. The statute of limitations for Wagner's claims pursuant to § 1983 is three years. *Lounsbury v. Jeffries*, 25 F.3d 131 (2d Cir.1994). Title VII's statute of limitations requires that allegations of discrimination be filed with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the putatively unlawful employment action. 42 U.S.C. § 2000e–5(e)(1). CFEPA provides an even shorter period. Conn. Gen.Stat. § 46a–82(e). Thus, only employment actions that occurred after April 2003 are properly before the Court. Wagner has not presented evidence linking Lt. Blanc or the circumstances surrounding her removal from the Community Enforcement Unit to any events after January 2001.

**14.** The DOC maintains that Officer Lane is African American.

**15.** While Wagner maintains that Officer Shelia Thompson, a white female, was "shown and given preferential treatment by Lt. Blanc," she has not provided more than this conclusory assertion.

sight, you should receive a written reprimand." In July 2006, Officer Graham was issued a written reprimand for exhaustion of sick time on March 26, 2006 and May 7, 2006. In August 2007, Officer Graham was again issued a written reprimand for exhaustion of sick time on April 25, 2007, July 13, 2007, and July 19, 2007.

Wagner maintains that Officer Lane had a reputation for being five minutes late for roll call and was given a one day suspension as a result.

According to Wagner, Officer Riker had "2.11 issues for as long as [she had] been at Cheshire." In March 2005, Officer Riker was issued a written reprimand after three instances of tardiness in a five month period.

Officer Betancourt was dismissed in September 2001 because he had been arrested on federal drug charges and failed to report for duty because he was incarcerated. Officer Betancourt was permitted to resign after filing a grievance.[16]

Officer Salerno was arrested for driving while intoxicated in November 1999. During the arrest, Officer Salerno threatened the arresting officers. Officer Salerno was dismissed in December 1999, but after filing a grievance she was offered a stipulated agreement allowing her to return to work in August 2000. The intervening period was treated as a suspension.

Officer LeClerc was dismissed in February 2002, after being convicted of unlawful restraint, a class A misdemeanor. After filing a grievance, LeClerc was offered a stipulated agreement allowing him to return to work following completion of his suspended sentence.

■ Wagner has failed to present sufficient evidence to permit a reasonable jury to determine that Officers Lane and Riker were similarly situated to Wagner or whether the DOC applied AD 2.11 more favorably to them. The evidence does indicate that AD 2.11 provided for stronger discipline of Officer Graham; he was reprimanded rather than suspended after three occasions of unauthorized leave in a twelve month period. However, Wagner also could have been disciplined more harshly; she was not suspended until she had four occasions of unauthorized leave in a twelve month period. Accordingly, Wagner's evidence is insufficient for a reasonable jury to find that Officer Graham was treated differently. Further, Wagner has not presented evidence that would allow a trier-of-fact to determine that Officers Betancourt, LeClerc, and Salerno were similarly situated; those Officers were disciplined after being convicted of criminal conduct, entirely different from the AD 2.11 conduct for which Wagner was disciplined. *See Graham*, 230 F.3d at 40.

The DOC also presented evidence concerning seventeen cases in which employees were dismissed for violations of AD 2.11. This evidence demonstrates consistent application of the guidelines in AD 2.11, and reinforces that no reasonable jury could find that Wagner was treated less favorably than similarly situated employees outside of her protected groups. Fifteen of the dismissed officers were male, nine were white, two were Hispanic, and six were black. Three of these employees had violations that were nearly identical to Wagner's violations: Officer Garth Sprague, a Hispanic male was dismissed after six occasions of unauthorized leave, totaling eleven days.[17] Officer Ezra

---

16. Officer Betancourt also had a history of discipline related to his dependability.

17. One of these occasions, totaling three days, was listed in Officer Sprague's written reprimand, but not in his dismissal notice.

Jones, a black male, was dismissed after four occasions of unauthorized leave in a twelve month period.[18] Officer Steven Smalls, a black male, was dismissed after six occasions of unauthorized leave in a twelve month period, totaling at least eleven days.[19]

Wagner has not presented evidence supporting an inference that AD 2.11 was applied differently to her because of her race or gender. The facts she alleges, taken as true for the purpose of this motion for summary judgment, do not give rise to an inference of discriminatory intent. Accordingly, she has not established a prima facie case of disparate treatment.

### B. *Hostile Work Environment*

"When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' ... that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' ... Title VII is violated." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (citations omitted); *see Mack v. Otis Elevator Co.,* 326 F.3d 116, 122 (2d Cir.2003).

In evaluating the severity or pervasiveness of the allegedly discriminatory workplace conduct, a court must look at all of the circumstances. *See Harris,* 510 U.S. at 23, 114 S.Ct. 367. A nonexclusive list of factors that courts consider in making such a determination includes "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unrea-

sonably interferes with an employee's work performance." *Id.*

As to the frequency, "[t]here is no fixed number of incidents that a plaintiff must endure in order to establish a hostile work environment." *Alfano v. Costello,* 294 F.3d 365, 379 (2d Cir.2002). The alleged incidents "must be more than episodic; they must be sufficiently continuous and concerted in order to be pervasive." *Carrero v. N.Y. City Hous. Auth.,* 890 F.2d 569, 577 (2d Cir.1989); *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1305 n. 5 (2d Cir.1995) (citations omitted) ("[T]he incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive."); *Kotcher v. Rosa and Sullivan Appliance Ctr., Inc.,* 957 F.2d 59, 62 (2d Cir.1992) ("The incidents must be repeated and continuous; isolated acts or occasional episodes will not merit relief.").

Wagner has not presented sufficient evidence of severe or pervasive workplace conduct. Further, as set forth above, she has not presented evidence that any workplace conduct occurring after 2001 was discriminatory.

### V. *Retaliation*

In order to "[t]o establish that an employer has unlawfully retaliated for an employee's having pursued a discrimination action," the Second Circuit has held that "the employee must show that he was engaged in a protected activity; that the employer was aware of that activity; that there occurred an employment action adverse to the employee; and that there existed a causal connection between the protected activity and the adverse employment action." *Hollander v. Am. Cyanam-*

---

**18.** According to the DOC, Jones was offered a "last chance" agreement, and was dismissed for violation of the agreement.

**19.** Neither party has presented evidence that a white officer was permitted to retain his position after five or more instances of unauthorized leave in a twelve month period.

id Co., 895 F.2d 80, 85 (2d Cir.1990). In the context of a retaliation action an adverse employment action must be "materially adverse," in that it would "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (internal quotation marks omitted). While "the anti-retaliation provision [of Title VII] … is not limited to discriminatory actions that affect the terms and conditions of employment," *id.* at 64, 126 S.Ct. 2405, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience," *id.* at 68, 126 S.Ct. 2405.

■ As with disparate treatment, once a plaintiff has satisfied his or her prima facie burden, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory basis for its action. *See Feingold,* 366 F.3d 138, 157 (2d Cir.2004). The burden then shifts back to the plaintiff "to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by discriminatory retaliation." *Raniola v. Bratton,* 243 F.3d 610, 625 (2d Cir.2001).

Wagner has not presented any evidence of a causal connection between any of her workplace complaints and any materially adverse employment action.

Accordingly, summary judgment is granted as to all aspects of Wagner's race and gender based discrimination claims.

**VI.** *Due Process*

■ The Due Process clause of the Fourteenth Amendment requires " 'some kind of a hearing' prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Wagner has failed to present evidence that the DOC's discipline and discharge procedures were constitutionally inadequate. Accordingly, summary judgment is granted as to Wagner's due process claims.[20]

**VII.** *Conclusion*

For the reasons set forth above, the defendants' motion for summary judgment [Dkt. # 26] is GRANTED.[21]

SO ORDERED.

---

**20.** Because Wagner has failed to present evidence of a violation of federal law, the individual defendants are also entitled to qualified immunity.

**21.** Because summary judgment is granted as to each of Wagner's substantive counts, it is also granted as to her declaratory judgment count.